Joseph BONTEMPO, Appellee,

v.

Peter FENTON, Warden, Rahway State Penitentiary, and James R. Zazzali, Attorney General of the State of New Jersey, Appellants.

No. 81–3016.

United States Court of Appeals, Third Circuit.

Argued Sept. 16, 1982.

Decided Nov. 16, 1982.

Rehearing and Rehearing In Banc Denied Dec. 10, 1982.

Certiorari Denied March 28, 1983. See 103 S.Ct. 1506.

Hillary L. Brunell (argued), Asst. Prosecutor, Irwin I. Kimmelman, Atty. Gen. of

New Jersey, George L. Schneider, Essex County Prosecutor, Newark, N.J., for appellants.

Roger A. Lowenstein (argued), Philip Rosenbach, Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, P.C., Roseland, N.J., for appellee.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

A state trial judge took the unusual step of permitting a defendant who had not testified to deliver a summation to the jury in addition to that made by his counsel. On rebuttal, the prosecution pointed out the defendant's failure to discuss crucial elements of the case. In this habeas corpus proceeding, the district court found that the prosecution's rebuttal included comment on the defendant's failure to take the stand. The court also held that, in choosing to make his own summation, the defendant did not effectively waive his right to counsel. On these grounds, the court granted the writ. Although the state trial proceedings were unorthodox and are not to be recommended, we conclude that they did not amount to constitutional violations. Accordingly, we vacate the order of the district court.

Petitioner Joseph Bontempo was found guilty in the New Jersey court of murder, robbery, escape and unlawful possession of a revolver. The convictions were affirmed on direct appeal. Bontempo then brought state post-conviction proceedings in the New Jersey Superior Court, Law Division. After an evidentiary hearing, the court denied relief, *State v. Bontempo,* 170 N.J.Super. 220 (Law Div.), 406 A.2d 203 (1979), and was affirmed on appeal. Next, Bontempo sought a writ of habeas corpus in the United States District Court pursuant to 28

U.S.C. § 2254. The writ was granted after an evidentiary hearing.

This case stems from the murder of Nicholas Sena, the proprietor of a delicatessen who was fatally shot at his store in New Jersey during a daylight robbery on April 7, 1974. There were no eye-witnesses to the shooting, but two police officers in a patrol car arrived on the scene shortly afterwards and saw Bontempo nearby changing his clothes.

Bontempo fled when he saw the police. He was apprehended after a short chase during which he took money from his pockets and threw it on the ground. His accomplice, a man named Zelinski, was captured while changing clothes in a nearby telephone booth.[1] Both men were placed in the back of the police car, where Bontempo was seen taking money from his pants, this time in an attempt to hide it in the crease of the car seat.

As the police were driving the two men back to the delicatessen, Zelinski produced a gun and ordered the officers to drive in another direction. The police testified that during the course of the ride, Bontempo appeared to be frightened and at one time told Zelinski not to shoot the officers. The police managed to flee from the car when it slowed for traffic. Zelinski exchanged gunfire with one of them, but no one was hit. Zelinski then drove off in the patrol car with Bontempo still in the back seat.

Two days later, the pair went to the home of Bontempo's cousin. Bontempo told his cousin's wife that he had struck the delicatessen owner over the head during the robbery and that Zelinski had shot the man. On the third day of their stay, Bontempo and Zelinski took an overdose of Seconal. While they were unconscious, Bontempo's cousin slipped away and notified the police, who came and arrested the pair. Bontempo was found with his hand on the revolver used in the murder.

---

1. One of the officers testified, "We saw a man [Bontempo] there changing clothes, taking his pants off, actually a pair of pants, he had another pair of pants on." The prosecution's theory was that Bontempo and Zelinski had worn two layers of clothing that day—"an outer set and an inner set"—so that after leaving the delicatessen they could remove the outer layer and depart, no longer matching any description that might be given by an eyewitness to the robbery.

At Bontempo's separate trial, his admission to his cousin's wife was put into evidence, along with testimony of the police officers and other witnesses who saw him changing clothes and running away. Additional evidence included the victim's wallet, some clothing and a revolver, which were all found near the area where Bontempo had first been seen by the police. Testimony also indicated that money was missing from the delicatessen. During a recess after the prosecution had rested, Bontempo conferred with defense counsel and decided not to take the stand. Bontempo presented no evidence and rested. This occurred on a Friday afternoon.

When court reconvened on Monday morning, the prosecutor and defense counsel gave their summations to the jury. The judge had begun the charge when Bontempo suddenly interrupted, shouting, "I would like to say something." The judge stated he would hear him, but asked the bailiff to remove the jury. Bontempo continued to shout, "I wanted to say it in front of the jury. I feel I am denied a fair trial." Before the jury could be removed, Bontempo stated, "I have nineteen witnesses to prove I did not do this crime.... I can't bring them in and I can't testify.... I have seen my attorney for 26 hours in seven months that I have been incarcerated in the Newark Street Jail." After the jury left the room, he continued, "Now, I am going to end up getting butchered in here. This is ridiculous."

The trial judge told Bontempo, "I am going to hear you, and you can make as many speeches as you want to the jury if you elect to do so.... I am going to let you say whatever you want to the jury, but before you do so, I thought I owed you the courtesy to first of all discuss what you want to say with your attorney, indicate to him what you want to say, get his best advice on it." After some further comments along those lines, the judge said, "Talk it over with [defense counsel]."

Bontempo explained to the judge that he wanted to speak to the jury, but was reluctant to take the stand because he had brain damage and might not remember things that would be asked on cross-examination. He wanted to have doctors called in to explain that a bullet injury had affected his memory. He also feared that his previous criminal record could be divulged, and repeated that he had witnesses who could exculpate him.

The trial judge stated that he would be willing to reopen the case so that Bontempo could either present additional testimony or speak to the jury. The judge observed that he had allowed defendants to make their own opening and closing arguments in other cases. He also said that if Bontempo elected to call witnesses or take the stand, the state could bring in rebuttal testimony. The judge added, "[I]f Mr. Bontempo elects that he wants to make a closing argument to the jury, the state will have an opportunity to make a further closing argument."

Bontempo and his lawyer then withdrew from the courtroom to confer. When they returned, Bontempo said he could not take the stand. The trial judge then asked if Bontempo wanted to say anything to the jury, and stated, "[Y]ou started to, sir, and I stopped you because I thought you wanted to discuss it with your lawyer.... If you want to say anything to the jury, I will permit you to do so, sir." This colloquy followed:

"[DEFENSE COUNSEL]: You can talk to the jury. The Judge is giving you an unusual opportunity.

[BONTEMPO]: I know, I know, I'm trying to think.

[DEFENSE COUNSEL]: But it is your decision to make. He will give you time to think. He will give you an opportunity.

[BONTEMPO]: I know, I'm trying to think. Yeah, all right, I'll talk to them. Yes, your Honor.

THE COURT: Pardon me?

[BONTEMPO]: Yes, I'll talk to them.

THE COURT: You want to talk to the jury?

[BONTEMPO]: Yes.

THE COURT: You realize the Prosecutor will have an opportunity to answer what you have to say?

[BONTEMPO]: Can he go first?

THE COURT: You go first.

[BONTEMPO]: Let him go first.

THE COURT: You go first. I'll tell the jury that everything you say they don't have to believe, because it won't be under oath. That's what I'll tell the jury.

[BONTEMPO]: Alright, yeah, what the hell. What have I got to lose?"

In his argument to the jury, Bontempo said he could not take the stand because his memory was impaired as a result of brain damage and his doctors were unavailable to testify. He spoke of the length of time he would have to serve if convicted and of the suffering his family would have to endure. He began his narrative of the events at the point where he saw the police car and said he ran away because he feared the car would run over him. He denied throwing money away, insisted he had never killed anyone, and said he was afraid of guns. He explained that his part in the police kidnapping and escape was caused by fear of Zelinski, and said he had persuaded Zelinski to join in taking the Seconal so his cousin could go to the police.

In rebuttal, the prosecutor reminded the jurors that the only testimony they were to consider and evaluate was that which came from the witness stand under oath. He then posed a series of questions about matters that Bontempo had not discussed.

"Was Mr. Bontempo in Mr. Sena's store on April 7, 1974? ... Was Mr. Sena killed in his presence or by him? ... Because as long as he talked he never talked about that.... Did he and Joey Zelinski go there to rob Mr. Sena? ... Did he hit Mr. Sena over the head with a gun? ... Did he flee from Mr. Sena's store after Mr. Sena was shot ...? That is another question or another area in which he never touched when he stood up and spoke.... He says he ran because he thought he was going to get hit by the police car. Do you believe that? Not under oath, a statement not subject to cross-examination."

The prosecutor also remarked that "Mr. Bontempo had his opportunity to speak to you.... Mr. Sena, he doesn't have an opportunity to tell you what went on there because he's dead...." Defense counsel did not object to any part of the prosecution's rebuttal.

The trial judge instructed the jury that Bontempo was entitled to a presumption of innocence and that no inference of guilt could be drawn from his decision not to take the witness stand. The jury returned verdicts of guilty on the counts of conspiracy, entry with intent to rob, felony murder, armed robbery, possession of a revolver and escape, but acquitted Bontempo on charges of entry with intent to kill, assault with intent to rob, kidnapping, assault with intent to kill, and larceny.

In the state post-conviction proceedings, Bontempo contended his fifth amendment privilege against self-incrimination had been violated by the prosecution's rebuttal and that, in making his statement to the jury, he had not validly waived his sixth amendment right to counsel.

The Superior Court found that the closing argument by Bontempo at the trial was communicative behavior which was "testimonial," notwithstanding his refusal to take the witness stand. Accordingly, the prosecutor's comments were held to be proper rebuttal and not in violation of Bontempo's fifth amendment rights. 406 A.2d at 215. The court stated that during "the post-conviction relief hearing, [Bontempo's] trial counsel testified that he discussed the possibility of Bontempo giving an unsworn statement to the jury, but that he never gave any specific advice in that regard." *Id.* at 216 n. 13. Moreover, there were findings that no unlawful coercion or pressure was used to compel Bontempo to waive his fifth amendment rights and that his waiver was voluntary, knowing and intelligent. *Id.* at 217.

In addition, the court ruled that Bontempo's "direct reference to his failure to take the stand and his accompanying explanation were an invitation to the prosecutor to comment upon the subject. *Lockett v.*

*Ohio,* 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973] (1978)." *Id.* The court also concluded that the "trial record fairly reeks of [Bontempo's] guilt" and that the "possibility of prejudice flowing from the prosecutor's comments [is] so remote as to preclude post-conviction relief." *Id.*

As to Bontempo's sixth amendment ground, the court stated that "since the issue was presented and decided on direct appeal, [Bontempo] is now precluded from relitigating the question," 406 A.2d at 211. It added, "In any event, [Bontempo's] argument is totally devoid of merit." *Id.* at 211 n. 4.

Bontempo asserted the same fifth and sixth amendment bases in his federal habeas petition. After its evidentiary hearing, the district court concluded that Bontempo's argument to the jury was non-testimonial, and that his waiver was not voluntary and knowing. The court conceded that, under the circumstances, the prosecutor had the right to comment that Bontempo had not testified and his explanations were not evidence. The district judge also recognized that the prosecutor was most likely permitted to comment on Bontempo's explanations themselves. But the court held that the prosecutor had gone too far in itemizing every point that the defendant had not addressed, and found the reminder that the dead man could not testify to be excessively prejudicial.

A sixth amendment violation was found because the "clear effect of the court's invitation to address the jury was a waiver of the assistance of counsel.... While it is true that counsel was present, and in fact encouraged [Bontempo] to make the statement, this cannot relieve the [trial] court of its responsibility. The court must assure itself that the defendant himself realizes the consequences of his actions. Merely informing the defendant that the prosecutor will respond is insufficient.... [H]ow or why the court would have encouraged a defendant with his limited intelligence and illness to render an unprepared closing argument without review by counsel is beyond comprehension." On these grounds,

the district court ordered that the state retry Bontempo or a writ of habeas corpus would issue.

■ At the outset, we note that the New Jersey courts have not approved the practice of allowing a represented defendant to make his own closing argument to the jury. In fact, the state post-conviction court commented that "[t]he procedure adopted by the trial judge is without precedential support and is of doubtful utility." 406 A.2d at 217. The issue before us, however, is not whether we approve of the procedure, nor whether we would permit it if the question were one within our supervisory authority over the federal trial courts within this circuit. The question is whether the actions of the state trial court or the prosecutor violated Bontempo's constitutional rights.

## I

Bontempo argues that since his remarks were not to be considered as evidence, the prosecutor was barred from commenting on his failure to take the witness stand. He relies on *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which held that the fifth amendment prohibits the court and prosecutor from commenting on a defendant's failure to testify. In *Griffin,* there was direct comment by the prosecutor on the defendant's refusal to take the stand coupled with instructions that the jury could consider failure to testify as tending to indicate the truth of the evidence against him. The Supreme Court viewed such comments and instructions as "a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." *Id.* at 614, 85 S.Ct. at 1232.

The case before us is different. Here, there was no direct reference in the summations to Bontempo's refusal to take the stand other than his own comments and explanations. The prosecutor's rebuttal was directed, not to Bontempo's lack of testimony as such, but rather to the closing argument. The prosecutor's questioning about gaps in the narrative that Bontempo had given to the jury is a common way of

attacking a defense summation, even one delivered by a lawyer.

The test for determining whether remarks are directed to a defendant's failure to testify is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *U.S. v. Chaney,* 446 F.2d 571, 576 (3d Cir.1971). Questions about the absence of facts in the record need not be taken as comment on defendant's failure to testify. *Braxton v. Estelle,* 641 F.2d 392, 397 (5th Cir.1981).

The circumstances here were unusual. The jury was told that Bontempo's argument could not be considered as evidence and yet he talked about facts which were not in the record. The prosecutor's comments about those unsworn accounts and about Bontempo's failure to mention other relevant events was fair reply to the unorthodox closing argument. The jury's attention had been focused on the facts mentioned in the closing argument, despite the instruction that they were not evidentiary. The prosecutor was not prohibited from recognizing the reality of the situation and answering Bontempo's narrative. We are not persuaded that in so doing the prosecution did comment on Bontempo's failure to testify. Consequently, *Griffin* is not applicable.

Even if the prosecutor's remarks did constitute comment on the failure to take the stand, they did not amount to a constitutional violation. As the district court found, Bontempo "stridently directed the jury's attention to his own failure to testify." He even offered an unsworn excuse. At that point, the issue was in the jury box, if it had not been there before. Jurors, after all, cannot help remembering that the defendant did not testify. To say that the prosecution violated Bontempo's rights by calling the jury's attention to something he

had already argued is to retreat from reality. Bontempo had made the point himself. If it was prejudicial, additional prosecutorial comment did not make it more so. Indeed, Bontempo's explanation for his failure to testify, untested by cross-examination, was probably more helpful to his cause than ignoring the matter altogether.

In *Lockett v. Ohio,* 438 U.S. 586, 594–95, 98 S.Ct. 2954, 2959, 57 L.Ed.2d 973 (1978), the Supreme Court held that because the defendant initially focused attention on her silence, prosecutorial comment on that fact was not reversible error. In that case, defense counsel, in his opening to the jury, outlined the defendant's case. Later, counsel also told the court, in the jury's presence, that the defendant would be the next witness after recess. When that time arrived, however, the defendant had changed her mind and did not take the stand. The Supreme Court concluded that the prosecutor's closing remarks about the state's "unrefuted" and "uncontradicted" evidence added nothing to the impression already created by defendant's refusal to testify and "did not violate constitutional prohibitions." *Id.* For the same reasons, we reject Bontempo's contention that the prosecutor's remarks were impermissible.

We conclude that there was no fifth amendment violation at the state trial.[2] We do not condone the prosecutor's comment to the jury that while Bontempo could speak to them, the decedent could not. Although that comment was objectionable, it did not rise to the level of a constitutional violation.

## II

Bontempo also contends that, in making his statement to the jury, he was deprived of the assistance of counsel in violation of the sixth amendment. The district court agreed that "[a]lthough counsel nominally represented [Bontempo] at this point, the

---

**2.** For cases where a *pro se* defendant did not take the stand, but brought out facts during presentation of the case which caused comment from the prosecution, *compare United States ex rel. Miller v. Follette,* 397 F.2d 363 (2d

Cir.1968), and *Redfield v. U.S.,* 315 F.2d 76 (9th Cir.1963), *with United States v. Curtiss,* 330 F.2d 278 (2d Cir.1964). *See* Note, 38 Temp. L.Q. 102 (1964) (criticizing *Curtiss* and approving *Redfield*).

clear effect of the court's invitation to address the jury was a waiver of the assistance of counsel, . . . [a] right [that] may be effectively waived only by intentional relinquishment or abandonment."

We are unable to accept Bontempo's argument. He was, in fact, represented before, during and after his statement by an experienced defense attorney. The trial judge's offer to reopen the case and allow Bontempo to either take the stand or make an argument to the jury was made only after his outburst during the charge to the jury. It was Bontempo's protest in the jury's presence that he was being denied a fair trial which precipitated the trial judge's unusual response.

■ The record reflects that after an extended colloquy, Bontempo and his lawyer heeded the judge's urging and left the courtroom to confer on the options extended by the court. Although defense counsel said he did not offer any advice during that conference on the desirability of Bontempo's argument to the jury, the option was discussed.[3]

When they returned to the courtroom, Bontempo's lawyer announced that Bontempo would not take the stand and the judge inquired whether Bontempo wanted to say anything to the jury. Bontempo replied, "How can I say something to the jury? I'm not a lawyer." The judge then reminded him, "You started to sir, and I stopped you because I thought you wanted to discuss it with your lawyer. . . . Now I'm not trying to foreclose you."

Counsel was present during this exchange, remarked that the judge was giving Bontempo an unusual opportunity and encouraged him to make the statement. Counsel repeated that it was Bontempo's decision to make, adding, "He [the judge]

will give you time to think. He will give you an opportunity."

■ Thus, the record makes it clear that Bontempo's decision was reached only after he had consulted with counsel outside the presence of the judge and later heard approval of that course of action by his lawyer in the courtroom. Nor was Bontempo pressed into making an immediate decision. His lawyer indicated that further time would be granted if necessary.[4] The decision was a tactical one and carried risks, but it is not at all clear, even in hindsight, that Bontempo blundered in deciding to talk to the jury.

Bontempo gained a number of advantages in making his statement. He gave an excuse for not testifying that may have been convincing to some of the jurors. He did so without giving the state an opportunity to reveal his previous criminal record, a matter which was one of the strongest factors leading to his refusal to take the stand. In addition, he was able to tell the jury that he had acted in fear of Zelinski and that he had arranged for the pair to take an overdose of Seconal so his cousin could summon the police.

Bontempo also tried to play on the jury's sympathy by telling them of his family's suffering and that he could get life imprisonment if found guilty. Most of these matters could not have been presented to the jury by a lawyer and so Bontempo fared better than most defendants in a criminal case.

There were some disadvantages too. By discussing the events of the day in question, Bontempo admitted that he participated in at least the kidnapping of the police officers and the escape. But there could not have been any doubt of these facts. There was

3. As noted earlier, the New Jersey post-conviction court found that defense counsel did, during the recess, discuss the possibility of Bontempo giving an unsworn statement. We are obligated, under 28 U.S.C. § 2254(d), to accord a presumption of correctness to "a determination after a hearing on the merits of a factual issue made by a State court," unless the determination falls within one of the seven catego-

ries of exceptions in section 2254(d) or "is not fairly supported by the record." *See Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

4. Bontempo never asked the trial judge for time to rehearse his summation with counsel, although the record indicates that such a request probably would have been granted.

no question of misidentification. By not mentioning his presence in the delicatessen, Bontempo did invite comment by the prosecutor. The failure to discuss that critical part of the case cannot be viewed as an oversight. Bontempo had no difficulty in remembering other events of the day when he wished to give a version favorable to himself.

It is true the jury was told that these factual statements by Bontempo should not be considered as evidence. Nevertheless, Bontempo obviously wanted them to be remembered by the jury and he can hardly complain that he was permitted to plant ideas in the jurors' minds without being under oath and subject to cross-examination. That his summation was not wholly ineffective is demonstrated by the fact that the jury acquitted him on the charge of kidnapping the police officers, a count on which there was ample evidence to support a conviction.

In sum, we are not persuaded that Bontempo has shown a violation of the sixth amendment.[5] His decision to address the jury was taken with the approval of his experienced counsel. This is not the case of an unrepresented defendant who is called upon to make an important decision without the benefit of expert advice.[6]

We conclude that the petitioner Bontempo has not established his right to a writ of habeas corpus and, accordingly, the order of the district court will be vacated.

SLOVITER, Circuit Judge, dissenting.

I agree with the majority that the state trial proceedings in this case were "unusual" and "unorthodox." In fact, that is a restrained understatement. Possibly as a result of the "unusual" nature of the proceedings, the usual precautions which have evolved to guarantee a defendant's constitutional rights were not followed. Therefore, I agree with the district court that a new trial is required.

Without detailing all of the proceedings of the trial, some of which are referred to in the majority's opinion, I highlight the salient events. Contrary to the prevailing view, the state trial judge was apparently under the impression that the defendant has an obligation to take the witness stand [1]

---

**5.** Bontempo also contends that by permitting him to deliver his own summation, the trial court "led him into a situation where he was prevented from testifying under oath ..." despite the holding in *Ferguson v. Georgia*, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961). (Pet. Brief at 44.) This contention is simply not supported by the record and has no merit.

**6.** As the dissent aptly notes, the unorthodox procedure used at the trial causes some difficulty in categorizing the alleged violations in this case. Although the dissent finds a partial deprivation of counsel in Bontempo's summation, his remarks were really supplemental to, and not in lieu of, retained counsel's closing to the jury. In the circumstances here, it is not clear that Bontempo's actions amounted to a "partial waiver of his right to counsel." But even if it be considered as such, cases on direct appeal such as *United States v. Welty*, 674 F.2d 185 (3d Cir.1982), are not controlling in this collateral attack on a state conviction where the petitioner must establish a constitutional violation. Moreover, the factual situation is quite different. Bontempo was represented throughout by counsel of his choice, unlike Welty who discharged appointed counsel just before trial began because of lack of confidence in his ability.

**1.** THE COURT: There is no God given right not to take the stand ... and the Prosecutor has a right to call for it.

The defendant doesn't have to take the stand.
[TRIAL COUNSEL:] We have a Constitutional Right not to take the stand.
THE COURT: Zicarelli says that it is not a God given right.
The only one who can rebut a fact is the defendant, *then he ought to take the stand,* and that is how the cases have held (emphasis added).

The view expressed by the trial court is at variance with the view expressed by the Supreme Court in *Hoffman v. United States*, 341 U.S. 479, 490, 71 S.Ct. 814, 819, 95 L.Ed. 1118 (1951), "The immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime." The *Zicarelli* case to which the trial court referred was apparently *Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972), where the Court upheld compulsory testimony in return for statutory use and derivative use immunity. It does not support the trial court's view that a defendant has an obligation to give testimony in the absence of such immunity.

and invited him to do so. Defendant declined, indicating that he recognized that if he gave up his constitutional right to remain silent, the prosecutor could cross-examine him on matters which otherwise would not be admissible. Following defendant's outburst at the conclusion of the trial, the trial court, *sua sponte,* offered to defendant the opportunity to "make as many speeches as you want to the jury if you elect to do so." The trial court apparently regarded this jury speech conjointly with or as an alternative to defendant taking the witness stand. The court stated to defendant:

> Now, Mr. Bontempo, of course you have a right to be heard, and I am going to hear you, and you can make as many speeches as you want to the jury if you elect to do so.
>
> My recollection is Friday I specifically asked you in the presence of your attorney if you wanted to take the stand. You indicated that you did not.
>
> I suppose my further question should have been, and I've asked this of several defendants, do you yourself want to say anything to the jury which you have a right to say?
>
> I am going to let you say whatever you want to to the jury, but before you do so, I thought I owed you the courtesy to first of all discuss what you want to say with your attorney, indicate to him what you want to say, get his best advice on it, and if you want to say to me first, so that I can give you the benefit of my advice on it, you may.
>
> On the other hand, if you want to say whatever you want to say without discussing it with anybody, you have a right to say it.
>
> That is up to you, sir.
>
> I am not trying to foreclose you from being heard. I just felt that you owed it to yourself and to your own case to discuss it with your attorney.

After some colloquy between the defendant and the judge, during which the judge on several occasions offered to reopen the case so that defendant could take the stand, the proceedings recessed so defendant could confer with his counsel.

At the post-conviction hearing, defendant's trial counsel testified that during the recess he never "advised" defendant on the idea of an unsworn statement or closing argument, and that the conference focused on the judge's reference to the possibility of reopening the case, taking the stand, and calling witnesses. When they returned to the courtroom, trial counsel reported to the court that he advised defendant not to take the stand, and asked the court to question defendant on that option once again. Again defendant declined, and the court then repeated its offer to defendant to speak to the jury. Defendant hesitated at this "opportunity" until his trial counsel told him "[t]he Judge is giving you an unusual opportunity." The judge assured the defendant his statement would not be testimonial, stating "I'll tell the jury that everything you say they don't have to believe, because it won't be under oath." Having thus been alternately invited and/or encouraged, defendant delivered to the jury a rambling pro se statement which amalgamated evidence and argument and during which defendant made some significant admissions.

After the defendant's statement, the prosecutor addressed the jury and repeatedly and vigorously commented upon the gaps and the omissions in the defendant's jury statement. The prosecutor, asking a series of rhetorical questions, told the jury that defendant's statement was "not subject to cross examination" and that "[t]hese are all questions which could have been but were not answered." In addition to commenting on the episodes to which defendant had alluded in his pro se statement, the prosecutor hammered away at defendant's failure to discuss the events in the grocery store where the murder was committed, telling the jury, "Mr. Bontempo had his opportunity to speak to you. *He never told you what went on there.* Mr. Sena [the victim], he doesn't have an opportunity to tell you what went on there because he's dead...." (emphasis added). Notwithstanding these

remarks, the trial judge failed to give any precautionary instructions to the jury regarding the prosecutor's comments with regard to defendant's failure to deny material facts.

As the majority notes, the district court found that defendant's Fifth and Sixth Amendment rights were violated by these "unusual" proceedings. In arguing on appeal that the district court correctly held that defendant's Fifth Amendment rights were violated, defendant claims this case presents "a catch-22 for the state." He argues, "If the [defendant's] remarks are 'testimony', thereby permitting rebuttal from the prosecution as if defendant had provided evidence under oath and subject to cross-examination, then the defendant had a constitutional right to have the jury instructed that his remarks were to be considered as evidence. Instead, the jury (and defendant) were specifically instructed by the court that the remarks *were not evidence....* On the other hand, if defendant's 'closing argument', to use the trial judge's characterization ... was nothing more than a *pro se* summation which could not properly be considered as evidence, then the prosecutor's comments on defendant's silence violated the Fifth Amendment as applied to the states by *Griffin v. California,* [380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)]." Bontempo's brief at 23–24 (emphasis in original). The majority's conclusion on this issue is that it is "not persuaded that ... the prosecution did comment on Bontempo's failure to testify", but that even if the prosecutor's remarks did constitute comment on the failure to take the stand, this was not a constitutional violation because Bontempo had already drawn the jury's attention to the fact that he had not testified.

Admittedly, the *sui generis* nature of the trial proceedings makes it difficult to find an analytic mold for Fifth Amendment purposes. I find it both regrettable and troublesome that the majority does not adopt the well-reasoned approach used in a similar situation by Judge Weinstein who held that since there was unsworn testimony in the pro se summation of the defendant, the

prosecutor was permitted to respond by commenting that such "testimony" had not been given under oath and was therefore less weighty than sworn testimony. *United States ex rel. Miller v. Follette,* 278 F.Supp. 1003, 1007 (E.D.N.Y.), *aff'd on other theory,* 397 F.2d 363 (2d Cir.1968) (prosecutor merely repeated fact already emphasized by defendant), *cert. denied,* 393 U.S. 1039, 89 S.Ct. 660, 21 L.Ed.2d 585 (1969). In this case, the prosecutor's comments on Bontempo's failure to discuss the events in the grocery store went far beyond the facts to which Bontempo referred in his pro se summation and far beyond the comments made by the prosecutor in the *Miller* case. Nonetheless, because I agree with the district court that defendant's Sixth Amendment rights were violated, I need not reach the district court's holding that the prosecutor's rebuttal to defendant's statement constituted impermissible comment on his failure to testify under *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

I begin the Sixth Amendment consideration by reviewing several well-established principles. A defendant has a constitutional right to counsel at each critical stage of the proceeding. *See United States v. Wade,* 388 U.S. 218, 226–27, 87 S.Ct. 1926, 1931–32, 18 L.Ed.2d 1149 (1967); *see also Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Argument to the jury at the conclusion of the trial is such a "critical" stage. A criminal defendant also has a constitutional right to conduct his or her own self-defense. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Before a judge may honor a defendant's decision to proceed by self-representation, the judge must ascertain whether the defendant has knowingly and intelligently elected to relinquish the benefits of counsel. *See Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The requirement that the waiver must be made "knowingly and intelligently" inheres in the constitutional right to counsel. It is therefore applicable in

state criminal trials as well as federal criminal trials. *See Faretta v. California, supra.*

The majority resolves the contention that defendant's Sixth Amendment rights were violated by noting that Bontempo was "represented before, during and after his statement by an experienced defense attorney", majority op. at 960; that "Bontempo's decision was reached only after he had consulted with counsel", *id.* at 960; and that "[h]is decision to address the jury was taken with the approval of his experienced counsel," *id.* at 961.

The majority characterizes the unusual statement by Bontempo to the jury as a pro se summation and I agree. As such, it must be treated as a waiver of counsel for that critical portion of the proceedings. The fact that Bontempo's trial counsel handled all of the other aspects of the trial including a summation does not alter the fact that a second summation was delivered by Bontempo rather than his lawyer. This pro se summation can be regarded as nothing less than a partial waiver of counsel. A partial waiver of counsel may be no less hazardous than a full waiver of counsel. In this case, for example, the pro se summation provided the last opportunity to speak to the jury on behalf of the defendant. What defendant said and did during that summation not only may have influenced the jury's view of the case but, as the majority concludes, opened the door for the prosecutor's subsequent comments on the factual omissions in defendant's statement. In considering a partial waiver of counsel, we must make the same inquiry into whether the defendant's waiver of counsel was made knowingly and intelligently as we would in a full waiver case. Other courts considering "hybrid" arrangements where a criminal defendant has conducted some or all of his own defense have also held that the validity of the partial waiver depends on whether defendant knowingly and intelligently waived his rights. *See United States v. Kimmel,* 672 F.2d 720, 721 (9th Cir.1982); *United States v. King,* 582 F.2d 888 (4th Cir.1978); *Maynard v. Meachum,* 545 F.2d 273, 277 (1st Cir.1976).

The polestar on waiver of counsel is provided by *Faretta v. California,* where the Court held that before a waiver of counsel can be accepted, the defendant must be "made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" 422 U.S. at 835, 95 S.Ct. at 2540. In this case the "dangers and disadvantages of self-representation" as to the summation were exceptional. Defendant, a lay person with no legal background or experience suffering from an apparent medical history of memory loss due to an earlier bullet wound, undertook to address the jury without any preparation and to make incriminating statements without the guiding hand of counsel who might have been able either to shift him away from the precipices or to elicit some ameliorating circumstances. There is absolutely no evidence in the record to show that defendant was ever advised by his experienced trial counsel that there were serious risks to defendant in undertaking his pro se summation; there is no evidence in the record that his counsel advised him as to how to proceed in a pro se summation or to steer away from comments of a testimonial nature and to limit himself to the evidence already admitted; and there is no evidence in the record to show defendant was informed that if he undertook a pro se summation which included some testimony, the prosecutor would be able to comment not only on what he did say but on what he did not say.

The majority apparently believes that the mere fact that the state court found "that defense counsel did, during the recess, discuss the possibility of Bontempo giving an unsworn statement" showed satisfaction of the *Faretta* standard. *See* majority op. at 960 n. 3. Even if the finding of such a discussion were "fairly supported by the record", 28 U.S.C. § 2254(d), which I question, the majority can point to nothing on record, because there is nothing, to show that the discussion was anything more than a passing reference to the trial court's offer to defendant to address the jury.

Because the substance of counsel's discussion with defendant is crucial to defendant's constitutional argument, I set forth here some of the relevant testimony of trial counsel in the state post-conviction hearing on this point:

[Trial Counsel:] Well, at any interruption of a trial—Judges are individual, and in Judge Fusco's court the defendant was told to either speak through counsel or to keep quiet. He was told that under the cases if he interrupted a trial and persists, there are certain sanctions, and in this particular case, it appeared to me that the Court got into a colloquy with the defendant. It appeared as though the Court led the defendant to believe that he could give a statement to the jury.

Q. I asked you before whether the statement was made on your advice?
A. No, no it was not. I couldn't contemplate—as a matter of fact, even when Judge Fusco mentioned the word statement, that a statement would be an unsworn statement. I think, and this is recollection, that I told Mr. Bontempo that if he elected to make a statement, that he would be putting himself in jeopardy. He said he didn't want to put himself in jeopardy.

I told him that he would be subject to cross-examination and whatever occurred to me at the time was my obligation to advise him as to the law. The question of an unsworn statement, that was never consulted about. The idea apparently originated with the Judge, who had at this point took charge of the trial.

\* \* \* \* \* \*

[A.] If I may for the record, I indicated that I did not know then, and I don't think even now despite what happened in this trial what might have happened in the Appellate Division that any Judge has a right to have any witness in the case, let alone the defendant, make an unsworn statement to a jury.

\* \* \* \* \* \*

Q. [To Trial Counsel:] [Y]ou have already testified that this Bontempo's reaction was not the result of your advice. Did you discuss an extemporaneous unsworn statement with him at all in an attempt to prepare him to make such a statement?
A. No.

Q. The statement, which I gather—the statement which he did make to the jury then, was being heard by you for the first time?
A. Yes.

\* \* \* \* \* \*

Q. Okay. Are you testifying that this, despite the fact that Judge Fusco laid this option out to you and told you to discuss it when you took that recess, the idea of an unsworn statement or a closing argument was never discussed?
A. I can't say that it was never discussed. I never advised him on it. What I did advise him was that it was a general statement that so far as the opening was concerned, I had opened. So far as the closing was concerned, I had closed. So far as his taking the stand or calling witnesses, he was being afforded an attempt. I went over what his exposure would be to cross-examination, and to the admittance of the record against him. I can't remember every word that was said. I do believe that we went back into the courtroom, and then the trial resumed.

Q. So, is it your testimony that you may have discussed with him his giving a closing statement to the jury?
A. I didn't discuss it with him in the sense of advising him.

Q. That's not my question. I'm sorry. My question is was the issue discussed of him giving a closing statement?
A. No. Not in that fashion.

\* \* \* \* \* \*

Q. So, you didn't discuss the idea of him giving a closing statement to the jury because you didn't think the Court would permit it?
A. I didn't think that that really was the issue. The Judge mentioned opening statements of what he had done in other

trials, and he permitted this to this defendant. He mentioned the closing statements and additional statements. He had permitted this to the defendant, and he mentioned the possibility of reopening the case, taking the stand, and calling witnesses.

\* \* \* \* \* \*

Q. Do you remember just before he gave the statement you were discussing with him, or on the record there was a discussion about what he was going to do, and you said to Mr. Bontempo you can talk to the jury, the Judge has given you an unusual opportunity. At that point, you knew that he was going to give a statement to the jury, did you not?

A. I knew he was going to talk to the jury, but I never pictured him being able to talk to the jury not under oath, and I thought . . . I still can't picture it though it happened, permitting a defendant after the Court closes—after the close of a case to address a jury.

Q. So, you thought that he was going to testify at that point?

A. I thought that he would get up and the Court will tell him he would have to be sworn, and that if he wanted to say anything to the jury, it would have to be under oath and from the witness box.

Q. Even when you said to him the Judge is going to let you talk to the jury, he's given you an unusual opportunity?

A. That's right.

It is apparent that counsel never advised the defendant of the "dangers and disadvantages" of a pro se summation, because counsel did not contemplate that such a procedure would be permitted. Even if counsel had mentioned the possibility to defendant during the recess, that would fall far short of imparting the information needed for a knowing and intelligent waiver.

Furthermore, the obligation to ascertain whether there has been a knowing and intelligent waiver is that of the trial court. In *Von Moltke v. Gillies,* 332 U.S. 708, 723–24, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948) (plurality opinion), the Supreme Court admonished that "in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand" (footnote omitted). In our recent decision in *United States v. Welty,* 674 F.2d 185, 187, 188–89 (3d Cir.1982), we held that the obligation of the trial court (in that case the district court) is to ensure that any decision by the defendant to represent himself was made intelligently and competently. We stated that, "It is vital that the district court take particular pains in discharging its responsibility to conduct these inquiries concerning substitution of counsel and waiver of counsel. Perfunctory questioning is not sufficient." *Id.* at 187.

Other federal courts considering waiver of counsel in the context of a habeas corpus proceeding have made clear that a state trial judge is required to talk to the defendant on the record to determine whether his waiver of counsel is knowing and competent. *See Brown v. Wainwright,* 665 F.2d 607, 611–12 (5th Cir.1982) *(en banc); id.* at 615 (Hatchett, J., dissenting); *Badger v. Cardwell,* 587 F.2d 968, 972 n. 3 (9th Cir. 1978); *Ford v. Wainwright,* 526 F.2d 919, 921–22 (5th Cir.1976); *Shawan v. Cox,* 350 F.2d 909, 912 (10th Cir.1965); *Hall v. Dorsey,* 534 F.Supp. 507, 508–09 n. 4 (E.D.Pa. 1982); *Martin v. Wyrick,* 433 F.Supp. 921, 927–29 (W.D.Mo.1977), *rev'd on other grounds,* 568 F.2d 583 (8th Cir.), *cert. denied,* 435 U.S. 975, 98 S.Ct. 1623, 56 L.Ed.2d 69 (1978). *But see Maynard v. Meachum,* 545 F.2d at 277.

In this case the following constitutes the total of the relevant colloquy between defendant and the trial judge after the recess at which Bontempo conferred with his lawyer:

THE COURT: Mr. Bontempo, you still have the right to take the stand if you wish to, sir.

THE DEFENDANT: I can't take it without my doctors.

THE COURT: Do you want to take the stand, sir?

THE DEFENDANT: No, I can't.

THE COURT: Do you want to say anything to this jury?

THE DEFENDANT: How can I say something to the jury? I'm not a lawyer.

THE COURT: I'll let you say—you started to, sir, and I stopped you because I thought you wanted to discuss it with your lawyer. Now I'm not trying to foreclose you. Everybody has a right.

It is your freedom that is at stake.

If you want to say something to the jury I will permit you to do so, sir.

[Trial Counsel:] You can talk to the jury. The Judge is giving you an unusual opportunity.

THE DEFENDANT: I know, I know. I'm trying to think.

[Trial Counsel:] But it is your decision to make.

He will give you time to think.

He will give you an opportunity.

THE DEFENDANT: I know, I am trying to think.

Yeah, all right, I'll talk to them. Yes, your Honor.

THE COURT: Pardon me?

THE DEFENDANT: Yes, I'll talk to them.

THE COURT: You want to talk to the jury?

THE DEFENDANT: Yes.

THE COURT: You realize the Prosecutor will have an opportunity to answer what you have to say?

THE DEFENDANT: Can he go first?

THE COURT: You go first.

THE DEFENDANT: Let him go first.

THE COURT: You go first. I'll tell the jury that everything you say they don't have to believe because it won't be under oath. That's what I'll tell the jury.

THE DEFENDANT: All right, yeah, what the hell. What have I got to lose?

THE COURT: All right, bring in the jury, please.

The trial court's failure to give defendant any guidance with regard to the subjects which may legitimately be discussed in summation, failure to inquire whether such guidance had been provided by his counsel, failure to warn defendant that if his remarks touched upon evidence, the prosecutor could respond to that testimony and could also comment on his failure to discuss other events fell far short of meeting the obligation imposed on trial courts. It fell far short of the advice and warnings given by other trial courts in somewhat analogous situations. Thus, for example, in *United States ex rel. Miller v. Follette,* the defendant had received "an explicit warning not to testify or comment on matters not in evidence." 278 F.Supp. at 1006. Judge Weinstein reasoned that a defendant would be adequately protected by "a clear and direct warning by the court that such limited comment [by the prosecutor on the unsworn 'testimony'] might follow if he continued to give what amounted to unsworn testimony." *Id.* at 1007. In *United States v. King,* 582 F.2d at 889, the trial judge had "engaged in a lengthy colloquy with King in an attempt to dissuade him from self-representation." In this case, there was no dissuasion, but what appears instead to have been encouragement. Defendant began his rambling untutored summation to the jury saying "I feel like a yo-yo" and ending it with saying "Go ahead. Sink me. I can go home dead now."

I agree with the following analysis by Judge Sarokin, the district judge who held that the habeas corpus writ should issue:

One wonders what would have motivated the trial court not only to permit the summation by petitioner, but to encourage it. It was clearly an invitation to the petitioner to bury himself. No competent counsel would ever make closing argument to a jury in any case, no less a murder trial, without long and thorough preparation. How or why the court would have encouraged a defendant with his limited intelligence and illness to render an unprepared closing argument without review with counsel is beyond comprehension. One cannot help wonder whether the offer made to petitioner was made to advance his rights or to defeat them. The helping hand which the court purportedly was extending to the petitioner, in reality held a noose.

It is no argument to say that the court merely honored the petitioner's request. The court exists to protect the constitutional rights of those who appear before it. We all err in that quest, but the active role of the court in this particular deprivation of rights mandates the granting of the petition (footnote omitted).

For the foregoing reasons, I respectfully dissent and would affirm the judgment of the district court.