**UNITED STATES of America**

v.

**Caleb SOTOMAYOR–TEIJEIRO,
Appellant.**

**United States of America**

v.

**Michael Lavin–Valdez, Appellant.**

**Nos. 11–2600, 11–3147.**

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit
LAR 34.1(a) Sept. 13, 2012.

Opinion Filed: Oct. 2, 2012.

Stephen R. Cerutti, II, Esq., Office of United States Attorney, Harrisburg, PA, Robert O'Hara, Esq., Office of United States Attorney, Scranton, PA, for United States of America.

Brandon R. Reish, Esq., Cramer, Swetz & McManus, Stroudsburg, PA, for Appellant.

Before: SCIRICA, ROTH and BARRY, Circuit Judges.

OPINION

BARRY, Circuit Judge.

Defendants Caleb Sotomayor–Teijeiro and Michael Lavin–Valdez appeal their convictions for various drug offenses. We will affirm.

I.

We write for the benefit of the parties and recite only the facts essential to our disposition. Because this appeal comes to us following a jury's guilty verdict, we set forth the facts in the light most favorable to the government.

On the morning of September 6, 2008, Trooper Nicholas Cortes of the Pennsylvania State Police stopped Vernon Combs for speeding along Interstate 80 in Monroe County, Pennsylvania. During the stop, Trooper Cortes noticed that the rental agreement for the vehicle did not authorize Combs to leave the state of North Carolina with the vehicle. He also ran a background check on Combs and found that he had a prior arrest for drug distribution. He then asked Combs for permission to search the vehicle, which Combs granted. During the search, Trooper Cortes found approximately 425 grams of crack-cocaine wrapped in plastic in the rear storage compartment.

After the drugs were found, Combs asked to cooperate. He told the police that he was involved in drug trafficking with Sotomayor–Teijeiro and Lavin–Valdez, who had been following him in a blue Lexus. Combs stated that they were all en route to Binghamton to drop off the crack and collect money owed from previous drug deals. At the behest of law enforcement, Combs called Sotomayor–Teijeiro and told him that he had been stopped by the police and that his car had been towed due to a violation of the rental agreement. He stated, however, that the tow truck driver had let him get the drugs out of the car before it was towed. When Sotomayor–Teijeiro and Lavin–Valdez came to retrieve Combs, they were arrested. Police searched the defendants and their vehicle, and found $2,200 cash in Lavin–Valdez's back pocket; several "owe" sheets or accounting ledgers; a receipt for certain common drug packaging supplies; and bank account records and receipts in both defendants' wallets.

A grand jury returned an indictment charging Sotomayor–Teijeiro and Lavin–Valdez with (1) conspiring to distribute and possess with intent to distribute at least 50 grams of crack-cocaine, at least 500 grams of cocaine, and an additional quantity of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B); and (2) aiding and abetting the possession with intent to distribute at least 50 grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), as well as 18 U.S.C. § 2.

Defendants proceeded to trial together on February 8, 2010. At trial, the government presented the testimony of a drug trafficking expert, Trooper James Hischar, who testified about the banking receipts found on the defendants. He explained that the receipts showed the defendants making substantial cash deposits into bank accounts in the names of other people. In particular, he testified that Lavin–Valdez had a receipt showing a $1,060 deposit made at a Bank of America near Richmond, Virginia, into an account under the name of Jose Villareal (with an address near Miami, Florida). Likewise, Sotoma-

yor–Teijeiro possessed receipts showing three cash deposits, totaling $11,960, that were made over a two week period into accounts in the name of Jesus Terrero or Jesus Terrero–Arroyo. These included a $4,940 cash deposit that was made on August 8, 2008. at 1:06 PM at a Wachovia Bank near Richmond, and was withdrawn about three hours later at another Wachovia Bank near Miami by someone purporting to be Terrero. There were also matching withdrawals from banks in the Miami area for Sotomayor–Teijeiro's other two deposit receipts. Trooper Hischar opined that this was a common tactic: drug dealers using bank deposits as a free wire transfer to instantly transmit money across the country.

In their summations, the defense attorneys urged the jury to discount the bank account evidence. Sotomayor–Teijeiro's attorney noted that the government had alleged a lengthy drug conspiracy involving large amounts of money, but had only come forward with bank records showing about $12,000 in deposits over a brief two week period. He also criticized the government for failing to determine whether Terrero was a real person or not, and suggested that the deposits might be for a legitimate purpose:

> [T]o give somebody a hundred dollars [using Western Union], it costs $15.99. The advent of international bank or national banks has eliminated the need for Western Union. If you owe somebody money, you deposit it into an account.... I go to my bank like I have for years, and the moment I walk up to the teller and try to make a withdrawal, I have to show my license. I have to be a real person.
>
> So I said to Trooper Hischar ... did you go and talk to Jesus and determine if that was a real person? No.... So we don't know if these were legitimate

or not legitimate deposits, transactions, withdrawals.

Likewise, Lavin–Valdez's attorney also suggested that the $1,060 receipt for a deposit into the account of Jose Villareal was not indicative of guilt because the government did not know who Villareal was and the deposit "could have been for anything, rent."

During his rebuttal summation, the prosecutor responded with the following statement about the bank accounts and money:

> No money was found on Sotomayor–Teijeiro or Michael Lavin–Valdez except for $2,200. All right. We have evidence of O. sheets, ledgers, deposits. Ask yourselves what's the money for? Where is the $12,000 come from? The only testimony that you heard in this case—the only testimony from the witness stand has been about drug trafficking. It's been drug trafficking. We haven't heard of any sources of income not from the witness stand—$12,000 in cash in a 12–day period deposited in Richmond, Virginia at 1:00 and withdrawn the same day three hours later in Miami. Jesus [Terrero], he gets around pretty good. He's in Richmond at 1:00 and Miami at four?

Counsel for both defendants objected to this statement as an improper "comment on the lack of evidence presented by the defense and refusal to testify or take the stand." The District Court denied their request for a mistrial and, on February 9, 2010, the jury returned a verdict finding defendants guilty on both counts.

Following the verdict, Lavin–Valdez moved for a new trial on the ground that his trial counsel, Bernard Brown, was ineffective due to an actual conflict of interest stemming from his professional association with Sotomayor–Teijeiro's counsel, Paul Walker. The District Court held an evi-

dentiary hearing on the motion for a new trial, and heard testimony from Lavin–Valdez, Brown, and Walker.

Following the hearing, the District Court issued an opinion rejecting the ineffective assistance of counsel claim. The Court acknowledged that Mssrs. Walker and Brown mingled their law practices in several ways, including through the sharing of office space and certain expenses, but found that "no partnership existed" between the attorneys. The Court noted that even if a partnership did exist, that would not imply a conflict of interest in this case because "a common interest prevailed" and "[t]here were no antagonistic defenses." Accordingly, the Court denied the motion for a new trial. At sentencing, Sotomayor–Teijeiro and Lavin–Valdez were each sentenced to two 120–month terms of imprisonment, to run concurrently. Both defendants filed timely appeals.

## II.

The District Court had jurisdiction over this case pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

### A.

■ The primary claim in these appeals is that the prosecutor violated the defendants' constitutional rights during rebuttal when he rhetorically asked the jury "[w]here [doe]s the $12,000 come from," and answered: "the only testimony from the witness stand has been about drug trafficking.... We haven't heard of any sources of income not from the witness stand...." Defendants contend that the District Court should have granted them a mistrial because these remarks improperly: (1) commented upon the exercise of their right to remain silent, and (2) implied that they bore the burden of proof at trial. A district court's denial of a mistrial is reviewed for abuse of discretion. *United States v. Hakim*, 344 F.3d 324, 328 (3d Cir.2003).

It is settled law that the Fifth Amendment prohibits a prosecutor from commenting on a defendant's exercise of his right to remain silent or failure to testify at trial. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). In the same vein, the prosecutor also "may not improperly suggest that the defendant has the burden to produce evidence." *United States v. Balter*, 91 F.3d 427, 441 (3d Cir.1996). Such comments raise "burden-shifting concerns" because they suggest that the onus is on the criminal defendant to prove his innocence, rather than on the government to prove his guilt. *See id.*

We have held that a prosecutor's "remark is directed to a defendant's silence," and therefore improper, "when 'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. Brennan*, 326 F.3d 176, 187 (3d Cir.2003) (quoting *Bontempo v. Fenton*, 692 F.2d 954, 959 (3d Cir.1982)). The remark "must be assessed in the context of the summation as a whole and of the evidence introduced at trial." *United States v. Brown*, 254 F.3d 454, 463 (3d Cir.2001). Generally speaking, statements regarding the "absence of facts in the record need not be taken as comment on a defendant's failure to testify." *Bontempo*, 692 F.2d at 959.

Analyzing the prosecutor's remarks in context, we cannot conclude that the jury would "naturally and necessarily" have perceived the remarks as either a comment on the defendants' failure to testify, or a suggestion that they bore the burden of proof. The prosecutor did not explicit-

ly mention the defendants, or claim that they could or should have taken the stand to offer a defense. Nor did he state that it was incumbent upon the defendants to put on evidence to prove a legitimate source for the money. Rather, the prosecutor's remarks simply reminded the jury that all the evidence they heard regarding the source and purpose of the money was that it was related to drug dealing, and urged the jury to draw the conclusion that drug trafficking occurred. In other words, the prosecutor did not shift the burden to the defense, but rather argued that the government had satisfied *its* burden by providing testimony that unequivocally supported its theory that the money was related to drug dealing. The Constitution does not prohibit the prosecutor from pointing out that the evidence was uncontroverted. *See Bontempo,* 692 F.2d at 959; *United States v. Mietus,* 237 F.3d 866, 871 (7th Cir.2001) (a "comment that the government's evidence is uncontradicted or unrebutted … [is improper] if the only person who could have rebutted the evidence was the defendant.").

The mere use of the phrase "from the witness stand" does not make the argument improper. The reference to the witness stand was a legitimate response to the defense attorneys' suggestions during summation that the money might be for legitimate purposes. Because statements of counsel are not evidence, the government properly reminded the jury that it was the testimony they heard "from the witness stand" that controlled. *See United States v. Robinson,* 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) (stating that if "the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, … there is no violation of the privilege").

Finally, the defendants' arguments are undermined by the jury instructions. In particular, the District Court explained the presumption of innocence and stated that it is the "prosecution's burden to prove the case proving the defendant guilty beyond a reasonable doubt." The Court noted that "the defendant has no obligation to testify or to present any other evidence," emphasizing that "you may not attach any significance to the fact that a defendant did not testify" and "[y]ou will have failed in your duty as citizens to permit yourself to consider this as a basis for determining your verdict." ·

Because the complained of remarks would not be naturally and necessarily perceived by the jury as a comment on the defendants' failure to testify or put on a defense, the District Court did not abuse its discretion in denying defendants' motion for a mistrial.

**B.**

■ Lavin–Valdez argues that the District Court erred in denying his motion for a new trial based on ineffective assistance of counsel. He must show that multiple representation created an actual conflict of interest that adversely affected his attorney's performance. *Government of Virgin Islands v. Zepp,* 748 F.2d 125, 135 (3d Cir.1984); *Cuyler v. Sullivan,* 446 U.S. 335, 348–49, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Multiple representation standing alone, or the mere possibility of conflicting interest, is not a constitutional violation. "The conflict of interest must be 'actual.'" *Zepp,* 748 F.2d at 135–36. "An actual conflict of interest 'is evidenced if, during the course of the representation, the defendants' interests diverge with respect to a material factual or legal issue or to a course of action.'" *United States v. Gambino,* 864 F.2d 1064, 1070 (3d Cir.1988) (quoting *Sullivan v. Cuyler,* 723 F.2d 1077,

1086 (3d Cir.1983)). "In addition, we have noted that an actual conflict is more likely to be found where an attorney takes positive steps on behalf of one client prejudicial to another as opposed to cases where the attorney's actions are based on inaction and are passive." *United States v. Morelli,* 169 F.3d 798, 810 (3d Cir.1999) (internal quotation marks omitted).

The District Court did not err in rejecting the ineffective assistance of counsel claim. Lavin–Valdez failed to prove that Brown engaged in "multiple representation" by "actively represent[ing] conflicting interests." *Zepp,* 748 F.2d at 135–36. The Court found that Mssrs. Brown and Walker were not partners and thus did not actively represent conflicting interests. This conclusion is not clearly erroneous. Brown testified that he was paid by Lavin–Valdez's family, and that he did not have a fee-sharing arrangement with Walker. Although the attorneys shared office space and some expenses, they kept their own clients. Brown did not discuss Lavin–Valdez's case or share confidential information with Walker. Nothing in the record suggests that Brown's loyalty was in any way divided or compromised by the office-sharing arrangement. The mingling of some aspects of two attorneys' law practices does not automatically equate to multiple representation. *See Duncan v. Morton,* 256 F.3d 189, 198 (3d Cir.2001) (holding that the district court's determination that two lawyers who shared office space "were not partners' for the purposes of multiple representation is not an unreasonable one"); *United States v. Pungitore,* 910 F.2d 1084, 1140 (3d Cir.1990). Multiple representation requires more than "a mere theoretical division of loyalties." *Mickens v. Taylor,* 535 U.S. 162, 171, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).

Even if the District Court had found multiple representation, however, Lavin–

Valdez's claim would still fail because he must also prove that the conflicting interests diverged at trial with respect to a material factual or legal issue or to a course of action. Lavin–Valdez generally alleges that "Mr. Brown made no attempt to shift responsibility from Lavin–Valdez to Sotomayor, despite the government's case being far stronger against Sotomayor." (Appellant's Br. at 18.) Lavin–Valdez notes that he does not speak English, and thus the testimony from the co-conspirators was that they had conspired with Sotomayor–Teijeiro, "yet they had never spoken with Lavin–Valdez." (*Id.* at 17.) This argument is simply incorrect. Brown *did* attempt to shift responsibility away from his client even if it meant shifting responsibility on to Sotomayor–Teijeiro:

> There's never any talk of Michael Lavin[-Valdez] being present on that first kilo [of cocaine]. Nobody said they had a conversation with [Lavin–Valdez]. Nobody says [Lavin–Valdez] is even present. Ricardo Youmans says he never had a conversation with [Lavin–Valdez] and that when he dealt—when he dealt with the trafficking of drugs, it wasn't Michael Lavin. *It was all Vernon Combs, Alian, Caleb [Sotomayor].* The only—only talking of [Lavin–Valdez]'s involvement is by Alian at the end here ... saying that he paid $10,000 to [Lavin–Valdez] to move marijuana.... You never see a bank deposit broken up the way you do in the other alleged transactions. All you see is a deposit of $600. Again, ladies and gentlemen, in all of the kilos in all of the money, in all of this drugs, [Lavin–Valdez] has $1,200 to his name in one MBNA bank account and a $600 transaction and then a transfer to Jose Villareal....

(emphasis supplied).

Because Lavin–Valdez cannot show that Brown actively represented conflicting in-

terests or that those conflicting interests diverged at trial, his ineffective assistance of counsel claim must fail. The District Court did not err in denying the motion for a new trial.

### III.

For the foregoing reasons, we will affirm the judgments of the District Court.