**George E. BANKS, Petitioner,**

v.

**Martin HORN, Commissioner, Pennsylvania Department of Corrections; James E. Price, Superintendent of State Correctional Institution at Greene; and Raymond Colleran, Superintendent of State Correctional Institute at Waymart; Commonwealth of Pennsylvania, Respondents.**

No. 4:CV–99–0438.

United States District Court, M.D. Pennsylvania.

Aug. 18, 1999.

Al Flora, Jr., Wilkes–Barre, PA, William Ruzzo, Kingston, PA, for petitioner.

Peter Paul Olszewski, Jr., District Attorney's Office, Luzerne County Courthouse, Wilkes–Barre, PA, for respondents.

### MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

On March 22, 1999, petitioner George E. Banks, an inmate at the State Correctional Institution at Waymart, Wayne County, Pennsylvania, commenced this action with the filing of a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. According to the petition, Banks was convicted in 1983 of twelve counts of first-degree murder, one count of third-degree murder, one count of attempted murder, and one count of robbery. Twelve consecutive sentences of death, plus a consecutive sentence of 25 to 50 years total incarceration, were imposed by the Court of Common Pleas of Luzerne County, Pennsylvania.

Banks has been granted leave to proceed *in forma pauperis,* counsel has been appointed, and a stay of a previously scheduled execution has issued.

On March 31, 1999, on initial review under Rule 4 of the Rules Governing Section 2254 Cases in the U.S. District Courts, 28 U.S.C. following § 2254, we issued a rule to show cause why four of Banks' claims should not be dismissed as procedurally barred. By Memorandum and Order dated May 7, 1999,[1] we dismissed those four claims as procedurally barred. In his brief, Banks has withdrawn his eighth claim. Brief in Support of Petition for Writ of Habeas Corpus at 14.

The remaining grounds for relief asserted by Banks, numbered as in the petition, are:

(1) The defendant did not effect a knowing, intelligent and voluntary waiver of his Sixth Amendment right to assistance of counsel.

(2) The defendant was not competent to waive his Sixth Amendment right to assistance of counsel.

(3) The defendant did not effect a knowing, intelligent and voluntary waiver of his Fifth Amendment right against self-incrimination.

1. To be published as *Banks v. Horn,* 49 F.Supp.2d 400 (M.D.Pa.1999), and currently available at 1999 WL 288531.

(4) The defendant was not competent to waive his Fifth Amendment right to protection from self-incrimination.

(5) The defendant was not competent to be tried, convicted and sentenced to death.

(6) The trial court's instructions to the jury in the sentencing phase, the verdict slip, and the jury poll required the jury to unanimously find both aggravating and mitigating circumstances in violation of the defendant's Eighth Amendment right to protection from cruel and unusual punishment.

(10) Pennsylvania's proportionality review statute deprives a defendant of due process of law under the Fourteenth Amendment.

The parties were provided with a briefing schedule, and all briefs have been submitted. The matter is now ripe for disposition.

Banks also has filed a motion to amend the petition to add a claim that he is not competent to be executed. The motion will be denied because, as Banks himself notes, it is not ripe for adjudication. Also, the claim has not been exhausted. The claim therefore is subject to dismissal and amendment would be futile. The motion to amend the petition will be denied.

### DISCUSSION:

## I. STATEMENT OF FACTS[2]

On the evening of September 24, 1982, Banks attended a birthday party in Wilkes–Barre. He was accompanied to the party by two girlfriends, and a third girlfriend was in attendance as well. Banks was at the party from approximately 9:00 until about 10:30 p.m. Between midnight and 1:00 a.m. of September 25, 1982, Banks called the location of the party and spoke to one of his girlfriends, Doro-

thy Lyons. Lyons was visibly upset by the call and left the party, accompanied by the last of Banks' girlfriends still in attendance. She took with her an AR–15 rifle belonging to Banks, apparently at Banks' request. The Colt AR–15 rifle is a military style, semi-automatic weapon, a civilian version of the M–16 used by American servicemen.

Shortly after 1:00 a.m., Banks was seen at a complex in which Lyons had an apartment. He was carrying a bag containing several small boxes, and commented to the witness who saw him that he (the witness) should not surprise people because he might get shot.

Banks was next seen on Schoolhouse Lane in Wilkes–Barre by a group of young people on the street. (Although referred to as "teenagers" by the Supreme Court of Pennsylvania, only one of the members of this group can have been a teenager at the time of the shootings. The two victims were aged 23 and 24, and a woman who was not shot was 21 at the time of trial. The remaining person present (a man) was 20 at the time of trial.) Banks owned a home at 28 Schoolhouse Lane in which noises like gunshots were heard by the youths at about 2:00 a.m. Banks appeared on the street wearing coveralls which witnesses consistently described as appearing to be of a military appearance. One of the youths stated that he knew Banks, to which Banks responded that he was "not going to live to tell anybody about this," and shot two of the youths. One of them survived but the other was pronounced dead later that morning.

When police were summoned to the scene, they called for an ambulance. Also, they were told about the sound of gunfire from 28 Schoolhouse Lane and went there

2. This summary of the facts is that set forth in an earlier memorandum, when this case was before this court initially. *Banks v. Horn*, 939 F.Supp. 1165, 1169–1170 (M.D.Pa.1996). We repeat the statement because, obviously, the facts have not changed. A more thorough recitation of the facts is set forth in the first

opinion of the Supreme Court of Pennsylvania in this matter. *Commonwealth v. Banks*, 513 Pa. 318, 324–335, 521 A.2d 1, 3–9 (1987). This case has a complicated procedural history, recited below. For the sake of simplicity, subsequent history is not provided in citations ·to prior related opinions.

to investigate. Inside they found the lifeless bodies of the three girlfriends of Banks who had been at the party as well as their five children, four of whom were fathered by Banks. All had gunshot wounds.

Banks was next seen in the vicinity of a lounge called the Cabaret. Two men were in their cars talking when Banks approached, in the same outfit, and pointed the AR–15 at the head of one of the men. Banks demanded that the man move over and got into the car. Banks let the owner out after a short distance but left with the car.

At about 2:30 a.m. shots were heard at the Heather Highlands Trailer Park in Jenkins Township, Luzerne County. Two boys present in one of the trailers described how Banks entered the trailer and grabbed Sharon Mazzillo (another girlfriend) with one arm while holding the AR–15 in the other. Banks said something like, "I shot some of my family, now I'm going to shoot some of yours." He then shot his son by Sharon, Kissmayu Banks, who was asleep on the couch. Sharon and her mother, Alice Mazzillo, then tried to push Banks out of the trailer, and Alice went to the bedroom to call police. Banks shot Sharon as she tried to run out the door of the trailer. Banks next choked, shot and kicked Scott Mazzillo, then struck him with the butt of the rifle. Finally, Banks shot Alice and left. One of the two boys left alive by Banks lifted the phone from Alice's body and completed the call to the police.

Banks later was tracked to his mother's home, but left before police arrived. Eventually, Banks was located in the home of a friend, having barricaded himself inside. Police surrounded the house but did not enter since Banks still had the AR–15 and was suspected of having hand grenades. Police tried to convince Banks that his children were still alive and needed his help. After more than four hours, Banks was talked out of the house and taken into custody. He made numerous statements admitting to the shootings.

Explaining conduct like that of Banks probably can never be done adequately. At trial, the Commonwealth took the position that Banks was motivated by a fear that he was losing control over his "family." Defense counsel presented psychiatric experts who testified that Banks suffered from paranoid psychosis. Succinctly stated, the experts testified that Banks, who is biracial, believed that he was the victim of a racist conspiracy. There was evidence also that Banks had made statements to the effect that he did not want his children to grow up in a racist world, and killed them to save them from suffering the effects of racism as Banks had.

## II. PROCEDURAL HISTORY

As indicated above, *see* Note 2, this case has been before this court previously. To place the matter into context, since the resolution of Banks' claims is affected, we will provide a procedural history of the case. A chronology of some of the more important events of this case is appended to this opinion as Court's Appendix I.

After Banks was convicted in the Court of Common Pleas of Luzerne County, he pursued a direct appeal to the Supreme Court of Pennsylvania, which affirmed. *Commonwealth v. Banks*, 513 Pa. 318, 521 A.2d 1 (1987) (*Banks I*). The Supreme Court of the United States denied a petition for certiorari. *Banks v. Pennsylvania*, 484 U.S. 873, 108 S.Ct. 211, 98 L.Ed.2d 162 (1987). Banks then sought post-conviction, collateral relief in the Court of Common Pleas under the Pennsylvania Post Conviction Hearing Act which was considered under the Post Conviction Relief Act (PCRA), 42 Pa.Cons. Stat.Ann. §§ 9541 et seq., which had become effective; the denial of relief was affirmed by the Supreme Court of Pennsylvania. *Commonwealth v. Banks*, 540 Pa. 143, 656 A.2d 467 (1995) (*Banks II*). The Supreme Court of the United States again denied a petition for certiorari.

*Banks v. Pennsylvania,* 516 U.S. 835, 116 S.Ct. 113, 133 L.Ed.2d 65 (1995).

After Pennsylvania Governor Thomas Ridge signed a death warrant for execution during the week of March 3, 1996, Banks filed with this court, *inter alia,* a motion to stay execution. We granted that motion and Banks filed a petition for a writ of habeas corpus under § 2254. We denied a motion to dismiss the petition as a mixed petition, finding that unexhausted claims were procedurally barred in the Pennsylvania courts. *Banks v. Horn,* 928 F.Supp. 512 (M.D.Pa.1996) (*Banks III*). *See also Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (mixed petition is one with both exhausted and unexhausted claims, and must be dismissed); *Toulson v. Beyer,* 987 F.2d 984 (3d Cir.1993) (if unexhausted claims are procedurally barred in state court, district court must dismiss unexhausted claims and consider merits of exhausted claims, but state law must clearly foreclose consideration of unexhausted claims). We then considered the merits of Banks' remaining claims and denied the petition. *Banks v. Horn,* 939 F.Supp. 1165 (M.D.Pa.1996) (*Banks IV*).

The Third Circuit reversed and remanded for dismissal of the petition as mixed, finding that Pennsylvania law did not clearly foreclose consideration of the unexhausted claims. *Banks v. Horn,* 126 F.3d 206 (3d Cir.1997) (*Banks V*). While the case was pending before the Third Circuit, Banks filed a second petition under the PCRA in the Court of Common Pleas, which denied relief. The Supreme Court of Pennsylvania affirmed the denial of relief, not for the reasons recited by the Court of Common Pleas, but instead finding that the second petition was time-barred under the amended version of the PCRA. *Commonwealth v. Banks,* 726 A.2d 374 (Pa.1999) (*Banks VI*).

After Governor Ridge again signed a death warrant, Banks brought the instant petition under § 2254, and a stay of execution again has issued. As noted above, *see* "BACKGROUND" and *Banks v. Horn,* 49 F.Supp.2d 400 (M.D.Pa.1999) (*Banks VII*), we have dismissed four of Banks' claims as procedurally barred under state law, and the petition no longer is a mixed petition.

## III. TIMELINESS

Respondents argue that Banks' petition is untimely under the one-year limitations period permitted for bringing a § 2254 petition after passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, 110 Stat. 1214. The relevant provision reads:

(d)(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any

period of limitation under this subsection.

28 U.S.C. § 2244(d).

According to respondents, Banks' judgment of conviction and sentence became final in 1987, when the Supreme Court of Pennsylvania affirmed on direct appeal and the Supreme Court of the United States denied certiorari. In *Burns v. Morton*, 134 F.3d 109 (3d Cir.1998), however, the Third Circuit held that petitioners must be afforded at least one year from the effective date of AEDPA before § 2244(d)(1) will bar the petition because they did not have notice of the limitation until AEDPA's effective date. Thus, the limitations period within which Banks was required to file a petition did not begin until at least April 24, 1996.

In addition, the Third Circuit has held that the time limit established by § 2244(d)(1) is a statute of limitations subject to equitable tolling. *Miller v. N.J. State Dept. of Corrections*, 145 F.3d 616 (3d Cir.1998).

■ On April 24, 1996, there were proceedings already pending in this court, and the matter went to the Third Circuit. The Third Circuit issued its opinion remanding to this court on September 19, 1997 (*Banks V*); we received a certified copy of the Third Circuit's judgment on October 17, 1997, and dismissed the action pursuant to that judgment on October 24, 1997. We think it evident that the time before October 24, 1997, is excluded from the period of limitations because a petition actually was pending in federal court during that time. The proceedings related to Banks' second PCRA petition were pending when the Third Circuit issued its order remanding for dismissal. Those proceedings ended when the Supreme Court issued its opinion, *Banks VI*, on March 2, 1999. The instant proceedings began on March 22, 1999.

Respondents rely on *Lovasz v. Vaughn*, 134 F.3d 146 (3d Cir.1998), in which the Third Circuit considered the tolling provision of § 2244(d)(2). Under that provision, the period during which a "properly filed" petition for collateral review is pending is not counted for purposes of § 2244(d)'s limitations period. The question becomes, then, whether the limitations period was tolled after the prior case in this court was dismissed and during the pendency of Banks' second PCRA petition, or between October 24, 1997, and March 2, 1999. More succinctly and directly stated, was Banks' second PCRA petition "properly filed"? According to respondents, it was not, because a petition must be timely to be properly filed. *Lovasz* at 147.

In our memorandum issued May 7, 1999 (*Banks VII*), we discussed the adequacy of the state grounds barring consideration of the four unexhausted claims asserted by Banks. 49 F.Supp.2d 400, 403–06. We noted that a ground is inadequate if, at the time an action must be taken by the petitioner to preserve a claim or claims, the rule is not clearly established. *Id.* at 403–04. If a rule is changed without notice to potential petitioners and bars consideration in state court of a claim which could have been considered prior to the change, such as by changing the time at which a claim must be raised after that time has passed, the ground is not adequate to support the judgment. *Id.* at 404–05 (relying on *Ford v. Georgia*, 498 U.S. 411, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991)).[3]

There are two important points to consider in reviewing respondents' argument. First, although the statute reviewed by the Supreme Court in *Banks VI*, 42 Pa.Cons. Stat.Ann. § 9545, is captioned "Jurisdiction and proceedings," it is not entirely clear that the subsection setting forth the time limit for filing a PCRA petition and exceptions thereto is intended to be jurisdictional in nature. The first subsection

---

**3.** Unlike the defendant in *Ford,* Banks had sixty days after the rule change (in the form of the amendment of the PCRA) to assert his claims. We therefore found the state grounds were adequate as a procedural bar. *Id.* at *4–*5 and *5 n. 2.

states that original jurisdiction is in the Court of Common Pleas. Sec. 9545(a). The third subsection puts a limit on the jurisdiction of the state courts to issue a stay of execution, using standard jurisdictional language ("No court shall have the authority...."). Sec. 9545(c). The fourth subsection sets forth standards governing admissibility of evidence, discovery, and privilege during and relating to an evidentiary hearing. Sec. 9545(d). The latter normally are not considered jurisdictional matters.

In contrast, the limitations subsection states that a petition "shall be filed within one year of the date the judgment becomes final, ..." with certain exceptions. Sec. 9545(b)(1).[4] The subsection does not state that no court will have the authority to entertain an untimely petition. Thus, since (1) not every subsection of the statute is jurisdictional in nature, and (2) the limitations subsection does not invoke clear language of jurisdiction, it cannot be said that § 9545(b) is necessarily jurisdictional in nature, as opposed to a statute of limitations subject to equitable tolling. *Cf. Miller* at 618 (AEDPA time limit statute of limitations subject to equitable tolling because term "jurisdiction" not used); *Calderon v. U.S. Dist. Court for C.D. of Calif.,*

128 F.3d 1283, 1288 (9th Cir.1997) (Kozinski, J.; opinion on which Third Circuit relied in *Miller;* also finding that failure to use language of jurisdiction indicates statute of limitations subject to equitable tolling), *reh'g, reh'g en banc denied, cert. denied,* —— U.S. ——, 118 S.Ct. 899, 139 L.Ed.2d 884 (1998).[5] That it is entirely reasonable to conclude that § 9545(b) is a statute of limitations rather than a jurisdictional provision is reflected in *Lambert v. Blackwell,* 134 F.3d 506, 523–524 (3d Cir.1997), in which the provision was so denominated.

The second point is that, prior to considering second petitions in the context of the amended version of the PCRA, the Supreme Court had applied a "relaxed waiver" standard for preserving issues for review in capital cases. *Banks VI* at 376 (citing *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982); *Commonwealth v. Beasley,* 544 Pa. 554, 678 A.2d 773 (1996), *cert. denied,* 520 U.S. 1121, 117 S.Ct. 1257, 137 L.Ed.2d 337 (1997)). Because it found the amended version of § 9545(b) to be jurisdictional in nature, however, it declined to apply (actually, without jurisdiction, it could not apply) the relaxed waiver standard in Banks' case. *Id.*[6]

---

4. The subsection reads in full:
 **(b) Time for filing petition—**
 (1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petition proves that:
 (i) the failure to raise the claim previously was the result of interference with the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
 (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
 (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.
 (2) Any petition invoking an exception provided in paragraph (1) shall be filed

within 60 days of the date the claim could have been presented.
 (3) For purposes of this subchapter, a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States or the Supreme Court of Pennsylvania, or at the expiration of time for seeking such review.
 (4) For purposes of this subchapter, "government officials" shall not include defense counsel, whether appointed or retained.
 42 Pa.Cons.Stat.Ann. § 9545(b).

5. The Ninth Circuit has overruled its prior opinion in *Calderon* but not for the reasons for which the Third Circuit cited the opinion. *Calderon v. U.S. Dist. Court for C.D. of Calif.,* 163 F.3d 530 (9th Cir.1998) (en banc).

6. The Supreme Court of Pennsylvania cited *Commonwealth v. Peterkin,* 554 Pa. 547, 722 A.2d 638 (1998), *reargument denied,* for the

■ Based on the foregoing, we do not think that, prior to the holding of the Supreme Court in *Banks VI*, Banks can be said to have had notice that § 9545(b) would be considered jurisdictional in nature. Only at the time of that ruling can it be said with certainty that Banks would be absolutely barred from presenting his unexhausted claims to the state courts on the basis of jurisdiction which, from respondents' point of view, also would mean that Banks had forfeited, without notice, his exhausted claims. We conclude that this would not be an adequate state ground or, at least, would be a reason for equitable tolling of § 2244(d)'s limitations period. We emphasize that the tolling of the limitations period is equitable, not the statutory tolling for which § 2244(d)(2) provides.

Of course, this must be contrasted with our earlier holding concerning the unexhausted claims (*Banks VII*). In that instance, Banks had sixty days' notice that the limitations period of § 9545(b) would become effective and might well bar his second PCRA petition, regardless of whether the basis was found to be jurisdictional or simply expiration of the limitations period and no basis for tolling. The prior notice is what supports the state law ground, i.e. makes it adequate, and bars presentation of the unexhausted claims in this court.

In our holding, we reach the same conclusion as was reached in *Fidtler v. Gillis*, 1999 WL 450337 (E.D.Pa. June 29, 1999), though by a different analysis.[7] In that case, the court found that the petitioner's claims in a petition under § 2254 had not been exhausted but might be barred by § 9545(b)(1).[8] Relying on cases decided prior to *Banks VI*, see *Fidtler* at *5–*6 (citing *Lambert; Commonwealth v. Alcorn*, 703 A.2d 1054, 1057 (Pa.Super.1997), *allocatur denied*, 555 Pa. 711, 724 A.2d 348 (1998) (table); *Commonwealth v. Ferguson*, 722 A.2d 177, 179 (Pa.Super.1998); *Commonwealth v. Austin*, 721 A.2d 375, 377 (Pa.Super.1998), *allocatur denied*, 1999 WL 266268 (Pa. May 04, 1999) (table); *Banks V*), the court dismissed the case so that the operation of § 9545(b) could be

proposition that, as a matter of jurisdiction, a PCRA petition must be filed within one year of final judgment. *Banks VI* at 376. While there is language in *Peterkin* to that effect, the holding is not altogether clear. The first reference to such a holding is the Supreme Court's recitation of the Commonwealth's position that the PCRA court lacked jurisdiction because the petition was untimely. *Id.* at 639. The next reference is the Supreme Court's quotation of § 9545(b)(1), including the caption of the section. *Id.* at 640. Finally, the Supreme Court stated, "As noted, on November 17, 1995, the General Assembly amended the PCRA to require that, as a matter of jurisdiction, a PCRA petition must be filed within one year of final judgment: . . .''; it then quoted § 9545(b)(1), (3), again with the caption. *Id.* at 641. Otherwise, the opinion is written in terms of the statutory exceptions to the one-year limitation period and the need for finality. No explanation is provided as to why the limitation is jurisdictional as opposed to a statute of limitations (or, to use the language of the caption, why "jurisdiction" applies and "proceedings" does not). Also, the future non-applicability of any form of the relaxed waiver rule is not discussed.

We conclude from all of this that *Peterkin*, unlike *Banks VI*, is not sufficiently clear to establish the jurisdictional nature of the one-year limitation rule to end the equitable tolling of Banks' limitations period. Even if it did, of course, since *Peterkin* was issued December 21, 1998, with reargument denied February 17, 1999, the period between December 21, 1998 (assuming the earlier date applies), and March 22, 1999, still would not have exceeded the one year allowed before bringing the petition in this court.

7. The difference in the analysis stems from the fact that this court previously dismissed a § 2254 petition pursuant to an order of the Court of Appeals and now is considering the second petition, while the court in *Fidtler* was considering the petition at the time of dismissal. Also, unlike the court in *Fidtler*, we are presented with an instance in which a second PCRA petition clearly is barred because the state courts already have so held. The court in *Fidtler* does not mention the applicability of *Banks VI* (that § 9545(b) is jurisdictional) to the facts before it.

8. Which the court denominated a "statute of limitations."

determined by the state courts in the first instance. However, because the petitioner's exhausted claims might be barred (as through taking more than a year to exhaust), the court dismissed without prejudice. In this way, the filing date of an amended petition would relate back to the date of the filing of the original petition under Fed.R.Civ.P. 15(c)(2), and the one-year bar could be avoided. *Id.* at 211–12.[9]

In other words, the court found that it would be unfair to require exhaustion only to have the time necessary for exhaustion lead to a bar of the petitioner's claims. This is especially so when there is a possibility that one or more of the exceptions to the jurisdictional time bar may apply. The *Fidtler* court therefore used the vehicle of dismissal without prejudice to avoid the statutory bar and resulting unfairness. In this case, we have determined that the limitations period was equitably tolled during the time that Banks' second PCRA petition was pending. Thus, the unfairness of not permitting a petitioner to present exhausted claims based on a time limitation which expires during a required attempt to exhaust other claims is avoided.

In short, we find that the statute of limitations under § 2244(d) was tolled during the period between October 24, 1997, and March 2, 1999. However, we limit our holding to the facts of this case, since the Supreme Court of Pennsylvania now has provided notice that § 9545(b) is to be read as a jurisdictional limit and not subject to relaxed waiver. Thus, the filing of an untimely PCRA petition would not toll the limitations period under § 2244(d) in every case.

## IV. STANDARD

■ The amended version of § 2254, which sets forth a more stringent standard for issuance of the writ, although not applicable to Banks' earlier petition, is now applicable because the instant petition was filed after the effective date of AEDPA. We note initially that we reject Banks' contention that pre-AEDPA standards govern because he filed an earlier petition that was dismissed as a mixed petition. Banks cites *Christy v. Horn*, 115 F.3d 201, 208 (3d Cir.1997), for the proposition that a petition which is filed after a prior petition was dismissed for failure to exhaust is not a second or successive petition. This very principle contradicts Banks' next argument, that his petition is a "continuation" of the proceedings related to his prior petition in this court. Actually, the point of *Christy* is that, once a petitioner has exhausted all of his state remedies and files a petition under § 2254, that petition is a "first" petition for purposes of the district court's authority to entertain the petition without prior approval of the court of appeals. *See* 28 U.S.C. § 2244(b)(3).

The same is true of *Stewart v. Martinez–Villareal*, 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998), on which Banks also relies. In that case, the Supreme Court equated a claim dismissed as unripe with a claim dismissed as unexhausted for purposes of whether a petition asserting the claim was a second or successive petition for purposes of § 2244. Thus, when the petitioner's claim that he was incompetent to be executed (dismissed initially by the district court as unripe) was presented later, the petition was to be considered a "first" petition and no authorization from a court of appeals was necessary.

---

9. The Third Circuit discussed a similar problem in *Morris v. Horn*, No. 98–9008 (3d Cir. Aug. 9, 1999), a slip opinion which was received in this court after the drafting of this opinion. Morris was granted an order similar to that in *Fidtler*. The Third Circuit indicated that, if the second PCRA petition was found to be untimely and the "relation back"

strategy was found to be invalid, the entire time that the second PCRA petition was pending was not tolled under § 2244(d)(2). *Id.* at 7. The Third Circuit indicated, however, that it was not deciding the question of equitable tolling, *id.* at 14 n. 5, the basis for our ruling in this case.

Banks points to language in *Stewart* which says, "A court where such a petition was filed could adjudicate these claims under the same standard as would govern any other first petition." 118 S.Ct. at 1622. Actually, any other first petition would be governed by the standards enacted in AEDPA.

Nothing in *Stewart, Christy,* or AEDPA indicates that pre-AEDPA law applies in cases in which the petitioner has had a prior petition dismissed for failure to exhaust. On March 22, 1999, when Banks filed the instant petition, which must be deemed his "first" petition under 28 U.S.C. § 2244(b)(3), AEDPA was in effect and AEDPA principles apply.

The relevant provisions now read:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

(e)(1) In a proceeding initiated by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(d), (e)(1). Also, the circumstances which would warrant an evidentiary hearing in the habeas court are strictly limited under 28 U.S.C. § 2254(e)(2).

■ Since AEDPA was passed, the state court decision is the starting point in habeas review. *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 885 (3d Cir. 1999). Section 2254(d) sets forth two conditions (subsections (d)(1) and (d)(2)), at least one of which must be met before habeas relief may be granted. *Id.* at 887. Examination of the first of these conditions entails a two-step analysis.

■ Before granting relief under § 2254(d)(1) for a state court adjudication of a claim "contrary to" established federal law as established by the Supreme Court, the habeas court first must "identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim." *Id.* at 888. "[T]his analysis requires 'something more than a recognition that the Supreme Court has articulated a general standard that covers the claim.'" *Id.* (quoting *O'Brien v. Dubois,* 145 F.3d 16, 24 (1st Cir.1998)). Rather, the petitioner must show that "'Supreme Court precedent requires an outcome contrary to that reached by the relevant state court.'" *Id.* (quoting *O'Brien* at 24–25). The Supreme Court precedent need not be factually identical to the petitioner's case, but must be a rule which, by virtue of factual similarity or distillation of general precepts into a channeled mode of analysis intended for application to variant factual situations, can fairly be said to require a particular result in the petitioner's case. *Id.* at 888–889.

■ If the state court decision was not "contrary to" applicable Supreme Court precedent, then the federal habeas court must determine whether the state court decision was based on an "unreasonable application of" established Supreme Court precedent. *Id.* at 889. An "unreasonable application" is not one with which the habeas court disagrees or one which leads to a different result than the habeas court would reach on its own. *Id.* Rather,

the "question is whether the state court's application of Supreme Court precedent was objectively unreasonable." *Id.* at 889–890. Under this standard, habeas relief is not warranted "unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Id.* at 890. While it is Supreme Court precedent that supplies the applicable rule, thereby precluding consideration of the opinions of lower federal courts on questions not addressed by the Supreme Court, a habeas court may consider lower federal court decisions in determining the reasonableness of the state court's application of Supreme Court precedent, that is, as helpful amplifications of Supreme Court precedent. *Id.*

 Prior to the passage of AEDPA, there was a presumption in habeas corpus proceedings that factual determinations by a state court were correct. *Jackson v. Byrd,* 105 F.3d 145, 147 (3d Cir.), *reh'g denied, cert. denied,* 520 U.S. 1268, 117 S.Ct. 2442, 138 L.Ed.2d 201 (1997).[10] Since AEDPA was enacted, the presumption of correctness still applies but the quantum of proof necessary to rebut the presumption has been increased (to the "clear and convincing" standard), making it more difficult for the petitioner to do so. *Warren v. Smith,* 161 F.3d 358, 360–361 (6th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 2403, 144 L.Ed.2d 802 (1999); *Bressette v. N.Y. State Div. of Parole,* 2 F.Supp.2d 383, 386–387 (W.D.N.Y.1998). Thus, federal courts on habeas review are required to give greater deference to factual determinations by state courts. *Bressette* at 387 (quoting, *inter alia, Ford v. Ahitow,* 104 F.3d 926, 936 (7th Cir.1997);

*Houchin v. Zavaras,* 107 F.3d 1465, 1470 (10th Cir.1997)). The presumption applies to findings of fact by both the trial and appellate courts of the state. *Id.* at 386.

## V. *MENTAL COMPETENCY*

Although not numbered first among the issues presented by Banks, we address first the question of Banks' mental competency at the time of trial because several of the claims flow from the competency issue.

 Even before enactment of AEDPA, the Supreme Court of the United States held that a state court's finding of competency was a factual matter which is binding on a federal court unless the record does not support the finding. *Demosthenes v. Baal,* 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990) (per curiam). However, the duty to determine a defendant's mental competency continues throughout trial, and a trial court must stop the trial and conduct a hearing when there are circumstances suggesting a change in the defendant's psyche rendering the defendant incompetent to stand trial. *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Still, there is no constitutional requirement of a second or successive hearing absent evidence of a substantial change in the mental condition. *Senna v. Patrissi,* 5 F.3d 18, 20 (2d Cir.1993).

 A criminal defendant is competent to stand trial if he or she has the ability to consult with counsel to a reasonable degree of rational certainty and has a rational and factual understanding of the proceedings. *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam); *McFadden v. United States,* 814 F.2d 144, 146 (3d Cir.1987).[11]

---

**10.** The Third Circuit has yet to address the standard for federal habeas review of factual findings by the state courts. Each of its recent opinions under § 2254 involved petitions filed before the effective date of AEDPA, so that pre-amendment standards applied. *See* Byrd at 147; *Buehl v. Vaughn,* 166 F.3d 163, 168–169 (3d Cir.), *cert. dismissed,* —— U.S.

——, 119 S.Ct. 2418, 144 L.Ed.2d 815 (1999); *Meyers v. Gillis,* 142 F.3d 664, 667 (3d Cir. 1998). Hereafter, then, we look to the language of the statute and opinions of other courts interpreting that language.

**11.** This test is codified at 18 U.S.C. § 4243(a). The analogous provision under Pennsylvania law is codified at 50 Pa.Stat.Ann. § 7402(a).

■ The trial court conducted a pretrial hearing to determine whether Banks was competent to stand trial. The court's finding of competence was supported by the testimony of a psychiatrist called by the Commonwealth and therefore is supported by the record. Banks argues, however, that his mental condition deteriorated during trial until he became incompetent; that is, he decompensated during trial. We discussed this issue at length in *Banks IV,* and we believe that discussion continues to be applicable:

> As noted, the trial court made a pretrial determination that Banks was mentally competent to stand trial. The court continued to observe Banks for signs that his condition with respect to competency had changed. *See, e.g.,* N.T. trial vol. 2 at 454–455 (June 8, 1983) (noting that questioning by and demeanor of Banks established competency); vol. 5 at 1,645 (June 16, 1983) (noting that trial court had seen nothing to warrant change of mind with respect to competency determination); *Banks I* at 13 (reciting factual finding of trial court as to Banks' demeanor and participation as related to competency, also set forth in present record in Respondents' Appendix A (record document no. 33, Opinion dated October 17, 1985, at 15 n. 2)). Banks asked meaningful, at times very insightful, questions of witnesses. *See, e.g.,* N.T. trial vol. 2 at 888–889 (June 9, 1983) (eliciting testimony of firearms/ballistics expert that it was unlikely that ammunition from weapon used would be found in body because of its velocity, despite fact that fragments were found in the body). It also should be noted, as pointed out by Banks, that defense counsel repeatedly reminded the trial court of its duty to consider Banks' competency through a number of motions to suspend proceedings for another competency hearing.

> Based on the foregoing, it is clear that the trial court remained mindful of its responsibility with respect to the determination of competency, and determined that Banks was mentally competent to stand trial.

> The only evidence of a change in the mental condition of Banks during the course of the trial to which he points is the testimony of Park E. Dietz, M.D., a psychiatrist called by the Commonwealth on the issue of Banks' sanity at the time of the offenses. N.T. trial vol. 5 at 1,800–1,888; 1,890–1,932 (June 17, 1983). Specifically, Dr. Dietz testified on direct examination, in part, as follows:

> > ... I had the opportunity to observe Mr. Banks testify yesterday, and his testimony shows that he has paranoia, to me.

> > I recognized, in his testimony, every one of the symptoms of his disease that has been discussed in the testimony I've heard. Yesterday Mr. Banks showed delusions and psychotic thought, which is really the symptom of this illness. And so, yesterday, I was able to observe that.

> > He's been said to be on a deteriorating course, getting worse with this illness. Dr. Spodak testified, in a hearing that I attended last February 28, that Mr. Banks was deteriorating rapidly. And there's been testimony since then that Mr. Banks is deteriorating. Given that and given the fact that he's been psychotic since he was in prison, I think yesterday I had a chance to see him at his worst and to see all the symptoms that Mr. Banks shows when he is at his sickest.

> *Id.* at 1,828. Dr. Dietz added later in his testimony on direct examination:

> > Now, Mr. Banks was described by Dr. Turchetti as being more floridly psychotic in February than he had been back in October, at the original interviews, and I think that significant, because I've indicated to you that Mr. Banks seems to be worse now than he was in the past; that his behavior on the witness stand is, by

all accounts, more seriously disordered than his behavior before the shootings and, in my opinion, at the time of the shootings, so the disorder, according to Dr. Turchetti, was worse in February than in October.

*Id.* at 1,835.

This testimony is consistent with all of the psychiatric testimony on the issue of whether Banks suffered from a mental disease or defect. That is, all of the psychiatrists agreed that Banks suffered from paranoia or paranoid psychosis, which is distinguishable from paranoid personality and paranoid schizophrenia. In the current version of the standard text on mental disorders, the disease described by the psychiatrists appears to be a "delusional disorder," subclassified as a "persecutory type." *Diagnostic and Statistical Manual of Mental Disorders* 296–298 (4th ed.1994). Dr. Weatherly cited an earlier version in his testimony. N.T. competency hearing at 10 (May 6, 1983) (citing *Diagnostic and Statistical Manual Three*, or third edition, and diagnosing as "numerically number 297.10").

The differences in the testimony appear in the opinions of the psychiatrists with respect to the impact of the disease on Banks' cognitive abilities. During trial, the psychiatrists called by the defense opined that, as a result of the paranoia, Banks was unable to understand the nature and consequences of his actions or to distinguish right from wrong at the time of the offenses, while the Commonwealth's psychiatrists reached the opposite conclusion (despite accepting the existence of the disease). In other words, the testimony was in conflict as to the effect of the disease on Banks' cognitive functions. *See esp.* N.T. trial vol. 5 at 1,828 (June 17, 1983) (testimony of Dr. Dietz that "... as for the effect on thinking, on judgment, on other areas of mental life, paranoia doesn't have an effect on those areas of mental life"). Moreover, Dr. Sadoff tes-

tified during the pre-trial competency hearing that Banks' paranoia did not render him incompetent to stand trial. N.T. competency hearing at 198 (March 15, 1983).

There are, then, two problems with Banks' argument that the testimony of Dr. Dietz required the trial court to suspend the trial and conduct a full-blown competency hearing. First, Dr. Dietz was not testifying that Banks actually was deteriorating or decompensating; he was assuming as much based on previous testimony. Second, there is not necessarily a link between the disorder and mental competency to stand trial; in fact, the trial court had rejected such a link, supported by Dr. Sadoff's testimony, when it found Banks competent after the original hearing. Considering this evidence and accepting as true Banks' contention that his paranoia grew worse as trial approached and during trial, it does not follow that Banks was not competent.

We conclude that: (1) the trial court fulfilled its ongoing, constitutional obligation to ensure that Banks was competent to stand trial; (2) the trial court's determination that Banks was competent is supported by the record; and (3) the equivocal nature of the evidence on which Banks relies, weighed against the evidence of the ongoing observation of Banks by the trial court, makes the testimony of Dr. Dietz insufficient to rebut the presumption that the determination of competency was correct. In the language of *Drope*, there are no "circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." Based on this conclusion, we find that grounds (2) and (4) of Banks' petition do not warrant habeas relief.

*Banks IV* at 1171–1173. We reach the same conclusions at this time. In the terms now applicable under § 2254(d), the decision of the state courts in finding that Banks was competent did not result in a

decision (1) contrary to or involving an unreasonable application of clearly established federal law or (2) based on an unreasonable factual determination in light of the evidence produced in the state court proceedings. The finding of competence leads to the denial of habeas relief for the claims numbered (2), (4), and (5).

## VI. WAIVER OF RIGHT TO COUNSEL

The first claim asserted by Banks (numerically) is that he did not effect a knowing and voluntary waiver of the right to counsel under the Sixth Amendment. Actually, Banks never waived the right to counsel and continued to be represented throughout the course of the trial. However, he did participate to some extent in the conduct of his defense. Banks' participation included personally cross-examining the ballistics expert called by the Commonwealth, testifying in his own defense, and directing counsel as to questions on cross-examination of the coroner and deputy coroners during presentation of the Commonwealth's rebuttal evidence. During his own testimony, Banks introduced photographs into evidence which had been excluded by the trial court during the Commonwealth's case in chief.

▆▆▆ Banks contends that, in allowing him to participate to such an extent in his defense, the trial court in effect allowed him to proceed *pro se* without conducting a colloquy as to whether the waiver of the

right to counsel was knowing and voluntary. *See generally Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Actually, Banks' participation in his defense constituted hybrid representation, which is a matter within the discretion of the trial court. *United States v. Einfeldt,* 138 F.3d 373, 378 (8th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 126, 142 L.Ed.2d 102 (1998); *United States v. Treff,* 924 F.2d 975, 979 n. 6 (10th Cir.), *cert. denied,* 500 U.S. 958, 111 S.Ct. 2272, 114 L.Ed.2d 723 (1991).[12]

In *United States v. Leggett,* 81 F.3d 220, 223–226 (D.C.Cir.1996), the defendant supplemented his counsel's questions with questions of his own, cross-examined three government witnesses, asked questions of two witnesses called by the defense, and made a closing argument after his own counsel's argument. Because Leggett did not forgo the right to counsel, instead supplementing representation by counsel, the District of Columbia Circuit held that he had not elected to proceed *pro se* and no colloquy was required. "Leggett wanted both the benefit of counsel and the ability to take the reins himself from time to time ... and by dint of the court's indulgence, he had his cake and ate it too." *Id.* at 226 (citation omitted).

Banks argues, however, that a waiver of the right to counsel is required even in the

---

**12.** We do not attempt here to establish a bright line between proceeding *pro se* and hybrid representation. At least one commentator has discussed such a bright line, concluding that a *pro se* defendant conducts the entirety of the defense. If there is standby or advisory counsel (the terms apparently meant to be interchangeable), counsel is present in the courtroom but silent as to the presentation of the defense. Standby or advisory counsel's role is limited to providing technical advice, protecting the record for appeal, and being available to take over the case if the defendant waives the right to proceed *pro se.* Whenever counsel takes any active role in the defense, it is termed a hybrid defense. Note, *The Accused as Co–Counsel: The Case for the*

*Hybrid Defense,* 12 Valparaiso L.Rev. 331, 331–332 (1978).

On the other hand, the Third Circuit in *Bontempo v. Fenton,* discussed in the text *infra,* held that a defendant was not required to waive the right to counsel because his own part in presenting the defense was merely supplemental to his counsel's representation. This holding can be taken to mean that the representation becomes effectively *pro se* at some point before the defendant takes over sole control of the defense; that is, at the point at which the defendant's role is no longer merely supplemental to counsel's role.

In this case, Banks supplemented rather than supplanted his counsel, and so the dilemma need not be resolved.

instance of hybrid representation. In support of this proposition, he cites three cases from the Ninth Circuit, *United States v. Turnbull*, 888 F.2d 636, 638 (9th Cir.1989), *cert. denied*, 498 U.S. 825, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990), *United States v. Kimmel*, 672 F.2d 720 (9th Cir. 1982), and *Evans v. Raines*, 534 F.Supp. 791, 797 n. 9 (D.Ariz.1982); a Tenth Circuit case which does not stand for the proposition for which it is cited, *United States v. Padilla*, 819 F.2d 952, 959–960 (10th Cir.1987); a Pennsylvania Superior Court case, *Commonwealth v. Palmer*, 315 Pa.Super. 601, 462 A.2d 755, 758 (1983); and the dissent in a Third Circuit opinion, *Bontempo v. Fenton*, 692 F.2d 954, 963 (3d Cir.1982) (Sloviter, J., dissenting), *reh'g, reh'g in banc denied, cert. denied*, 460 U.S. 1055, 103 S.Ct. 1506, 75 L.Ed.2d 935 (1983).

We begin with the Tenth Circuit opinion, *Padilla*. In that case, the defendant elected to proceed *pro se*. The Tenth Circuit stated that the appointment of standby counsel is preferred in such circumstances but the court still must ensure that the waiver of the right to counsel is knowing and intelligent. 819 F.2d at 959–960. Banks recites the holding in this respect as "valid waiver of counsel required when there is anything less than full representation by counsel." Brief in Support of Petition for Writ of Habeas Corpus at 8. Actually, the opinion states, "Anything less than full representation by counsel raises the question of valid waiver of the right to counsel." *Padilla* at 960 (citations omitted).

Thus, while it is true that *Padilla* stands for the proposition that the court must examine whether the arrangement is one of hybrid representation or *pro se* status with standby counsel (the latter requiring a waiver of the right to counsel), and suggests that anything less than full representation gives rise to this duty to examine, it

does not equate hybrid representation with *pro se* status. In fact, the Tenth Circuit in *Treff* (at 979 n. 6) noted that a request to proceed with hybrid representation is not deemed a request to proceed *pro se*, thereby specifically distinguishing the two situations. Also, in *Treff*, the defendant argued that his right to represent himself was violated when his request to participate in his defense was denied. The Tenth Circuit held that he did not make an unequivocal request to proceed *pro se*, and so the argument failed. It should be noted however, that the defendant was permitted to begin an opening statement.[13] That action was not found to be the equivalent of proceeding *pro se*.

 We conclude that the Tenth Circuit does *not* require a waiver of the right to counsel under *Faretta* before the trial court may exercise its discretion to permit hybrid representation.

Banks' citation to *Palmer* also misses the mark. In that case, the defendant elected to proceed *pro se* with the exception of selecting a jury, making closing remarks, and filing post-trial motions. Those actions would be left to standby counsel, who also would confer with the defendant during trial. *Palmer* at 758. The defendant would personally make an opening statement and examine witnesses. *Id.* at 758–759. The Superior Court held that this arrangement really did not constitute *pro se* representation but a partial waiver of the right to counsel. *Id.* at 759. Thus, a colloquy on the partial waiver was necessary, but only as to those aspects of the trial for which the defendant would be representing himself. *Id.*

Several points must be emphasized about *Palmer*. First, the Superior Court referred to Pa.R.Crim.P. 318(c), not the Constitution, as the basis for its ruling. Second, the trial court did instruct the defendant on those aspects of the trial for

---

**13.** Treff's opening statement was cut short when he accused the trial judge of bias. *Treff*

at 979.

which he represented himself, which is the same as occurred in this case: the trial court warned Banks about the wisdom of those actions taken *pro se.* Finally, the Superior Court concluded in *Palmer* that the defendant was proceeding effectively *pro se.* We have not so concluded, and therefore the principle announced in *Palmer* is inapplicable.[14]

More on point is *State v. Layton,* 189 W.Va. 470, 477–479, 432 S.E.2d 740, 747–749 (1993) (citing, *inter alia, Bontempo,* discussed below, and *Palmer* ), in which the rationale for distinguishing between *pro se* representation and hybrid representation is discussed thoroughly. Succinctly stated, when counsel participates in the defense of the case by assisting the defendant and actually presenting the defense, there is not the danger faced by a defendant who opts to represent himself or herself, or with merely a technical advisor. *Id.* at 478, 432 S.E.2d 740, 432 S.E.2d at 748 (quoting *State v. Barker,* 35 Wash.App. 388, 395, 667 P.2d 108, 113 (1983)).

We do not believe that it is necessary to determine the exact contours of what will constitute hybrid representation versus standby counsel or advisory counsel. Whatever the precise extent to which counsel must participate in the defense before counsel will be part of hybrid representation, as opposed to standby or advisory counsel, we think that there plainly was hybrid representation of Banks.

We turn next to the only Third Circuit opinion cited by Banks, *Bontempo,* an appeal from the granting of a writ of habeas corpus. In that case, the state trial court was giving the final charge to the jury when the defendant interrupted by shouting, "I would like to say something." The outburst continued before the jury was removed from the courtroom. The judge indicated that the defendant would be permitted to address the jury (in effect a closing argument) and even to reopen the defense for further testimony, and allowed the defendant to consult with counsel. After consulting with his attorney and a short colloquy with the court, the defendant addressed the jury. 692 F.2d at 956. One of the defendant's arguments was that the additional summation deprived him of the assistance of counsel in violation of the Sixth Amendment. *Id.* at 959–961.

In a 2–to–1 decision, the Third Circuit found no violation of the Sixth Amendment for several reasons, such as the fact that his statement permitted him to place before the jury a number of matters which would not have been admissible had he testified under oath. The tactic also permitted the defendant to avoid cross examination on his prior criminal record. *Id.* at 960. Most important for present purposes is the following portion of a footnote in the majority opinion:

> As the dissent aptly notes, the unorthodox procedure used at the trial causes some difficulty in categorizing the alleged violations in this case. Although the dissent finds a partial deprivation of counsel in Bontempo's summation, *his remarks were really supplemental to, and not in lieu of,* retained counsel's closing to the jury. In the circumstances here, it is not clear that Bontempo's actions amounted to a "partial waiver of his right to counsel."
> . . .

*Id.* at 961 n. 6 (emphasis added).

In dissent, Judge Sloviter viewed the defendant's statement to the jury as a partial waiver of the right to counsel re-

---

**14.** In *Commonwealth v. Lloyd,* 370 Pa.Super. 65, 535 A.2d 1152, *allocatur denied,* 518 Pa. 637, 542 A.2d 1367 (1988)(table), the Superior Court relied on *Palmer* in holding that the standard of completeness of the colloquy under Rule 318(c) is lower when standby counsel is appointed. The Supreme Court of Pennsylvania abrogated *Lloyd* in *Common-* *wealth v. Brazil,* 549 Pa. 321, 326, 701 A.2d 216, 219 (1997), when it held that a full and complete colloquy is necessary whenever a defendant seeks to waive the right to counsel. This holding undermines, and probably abrogates, the holding of *Palmer* to the effect that a partial waiver only requires a partial colloquy.

quiring the same inquiry as a complete waiver. *Id.* at 964. Rather obviously, a dissenting opinion would not be a valid basis on which this court may rely; we are bound by the majority opinion. Since the Third Circuit has held that a represented defendant may "supplement" his defense, the situation in this case, Banks' argument fails.

With respect to the opinions of the Ninth Circuit cited by Banks, we disagree with the reasoning and adopt instead the rationale stated in *Layton*. This would be so even if we were not bound by *Bontempo*.

Also, after this review of the law of hybrid representation, we note that Banks points to no opinion of the Supreme Court of the United States which would clearly establish that a criminal defendant is entitled to an inquiry by the trial court before it exercises its discretion to permit hybrid representation. Rather, *Faretta* and *McKaskle* were addressed to the right to proceed *pro se* and to the more traditional situation of a defendant appearing *pro se* with the court appointing standby counsel for the purpose of answering procedural questions. The absence of Supreme Court authority existed at the time of Banks' trial and continues today, so that retroactivity analysis is not implicated. Banks is not entitled to habeas relief in absence of such authority, and the claim numbered (1) must be denied on this basis.

## VII. WAIVER OF RIGHT AGAINST SELF–INCRIMINATION

In his claim numbered (3), Banks alleges that he did not effect a knowing, intelligent and voluntary waiver of his right against self-incrimination under the Fifth Amendment. The primary basis for this claim is that Banks was not competent to waive his rights. The issue of competency has been addressed and resolved against Banks, and so this argument fails.[15] Banks is not

entitled to habeas relief on the claim numbered (3).

## VIII. JURY INSTRUCTIONS, VERDICT SLIP, JURY POLL

Banks' sixth claim is that the trial court's instructions to the jury, the verdict slip, and the jury poll in the sentencing phase all required the jury to find unanimously both aggravating and mitigating circumstances, in violation of the defendant's Eighth Amendment rights. Such a requirement would violate the rule of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). *See also McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). As we noted in *Banks IV*, there is no substantial difference between the charge and verdict form used by the trial court in this case and the charge and verdict form reviewed by the Third Circuit in *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 306–309 (3d Cir.), *reh'g denied, cert. denied*, 502 U.S. 902, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991).

> [The jury charge and verdict form] state repeatedly that the jury must find unanimously at least one aggravating circumstance beyond a reasonable doubt and that any aggravating circumstances so found must out weigh any mitigating circumstances (to be found by a preponderance of the evidence). They also state that the final verdict must be unanimous. Nowhere is there a statement that any mitigating circumstances must be found unanimously by the jury before they could be weighed against any aggravating circumstances.

*Banks IV* at 1174. *See also DeShields v. Snyder*, 829 F.Supp. 676, 688 (D.Del.1993) (reaching same conclusion reviewing similar jury instruction). In fact, other federal courts have been consistent in holding that there is no constitutional violation in jury

---

**15.** Regardless, it should be noted that the trial court in fact did warn Banks concerning his

decision to testify.

instructions which state that the jury must be unanimous in finding aggravating circumstances and do not state that the jury must be unanimous as to any mitigating circumstances, but also do not specify that the jury need not be unanimous as to any mitigating circumstances. *See Noland v. French,* 134 F.3d 208, 213 (4th Cir.) (citing *Smith v. Dixon,* 14 F.3d 956, 981 n. 15 (4th Cir.) (en banc), *cert. denied,* 513 U.S. 841, 115 S.Ct. 129, 130 L.Ed.2d 72 (1994); *Lawson v. Dixon,* 3 F.3d 743, 754 (4th Cir. 1993), *cert. denied,* 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 556 (1994); *Maynard v. Dixon,* 943 F.2d 407, 418–420 (4th Cir. 1991), *cert. denied,* 502 U.S. 1110, 112 S.Ct. 1211, 117 L.Ed.2d 450 (1992)), *cert. denied,* 119 S.Ct. 125, 142 L.Ed.2d 101 (1998); *Duvall v. Reynolds,* 139 F.3d 768, 791–792 (10th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 345, 142 L.Ed.2d 284 (1998); *Griffin v. Delo,* 33 F.3d 895, 905–906 (8th Cir. 1994), *reh'g, reh'g en banc denied, cert. denied,* 514 U.S. 1119, 115 S.Ct. 1981, 131 L.Ed.2d 869 (1995); *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1120–1121 (6th Cir.1990) (en banc; dissenting opinion),[16] *cert. denied,* 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991).

In contrast, the Third Circuit has reviewed a jury charge similar to that used by the trial court in this case, and to many of those discussed in the cases cited above, and concluded that "it was reasonably likely that the jury could have believed that it was required to find the existence of mitigating circumstances unanimously before those circumstances could be considered in its deliberations." *Frey v. Fulcomer,* 132 F.3d 916, 924 (3d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2076, 141 L.Ed.2d 151 (1998).[17] Banks relies on *Frey* due to the similarity of language in the jury charges.

There are several problems with reliance on *Frey.* First, it does not appear from the language of § 2254 that the principles enunciated in *Frey* are applicable to the case before us. *Frey* involved a habeas petition filed prior to AEDPA, so that the amended version of § 2254 did not apply. That section now permits the granting of relief only if the state courts' resolution of the federal issue "resulted in a decision that was contrary to, or *involved* an unreasonable application of," Supreme Court precedent. Sec. 2254(d)(1) (emphasis added). The use of the past tense indicates that it is the time of the state court decision that is relevant, not the time of habeas review. *See also* § 2254(e)(2)(A)(i) (condition for evidentiary hearing is that new rule of constitutional law has been made retroactive to cases on collateral review by Supreme Court, thereby precluding retroactivity analysis by habeas court). *Mills* was not decided until 1988, some five years after Banks' conviction and sentence, and has not been made retroactive by the Supreme Court. Because we find that the language of AEDPA establishes that the point in time at which the Supreme Court precedent must be "clearly established" is at the time that the state court makes its ruling on the federal constitutional issue, we do not address the parties' arguments concerning the retroactivity of *Mills.*

Moreover, as reflected in the decisions cited above, Supreme Court precedent (in the form of *Mills* and *McKoy* ) did not require an outcome contrary to that reached by the state courts. That the Third Circuit reached a contrary result does not mean that the decision of the state courts was unreasonable.

Banks is not entitled to habeas relief on his claim numbered (6).

---

**16.** Although part of the dissenting opinion, nine judges including the author joined the portion cited (designated Part IV of the dissent). Since thirteen judges were sitting en banc, Part IV commanded a majority.

**17.** This issue is likely to recur, since the Supreme Court of Pennsylvania adamantly rejected the Third Circuit's opinion in *Frey. Commonwealth v. Cross,* 555 Pa. 603, ——, 726 A.2d 333, 336–338 (1999).

## IX. PROPORTIONALITY REVIEW

Finally, Banks contends that the Pennsylvania statute governing proportionality review which was in effect at the time of his initial appeal to the Supreme Court of Pennsylvania violated his right to procedural due process.[18] This claim lacks merit for a number of reasons.

First, proportionality is not constitutionally mandated. *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the petitioner challenged some of the wording of an aggravating factor under the Arizona death penalty statute which had been limited by the state supreme court's construction. The Supreme Court of the United States found that, with the added interpretation, the challenged language provided sufficient guidance to the sentencer. *Id.* at 655, 110 S.Ct. 3047.

The Supreme Court added:

> Walton nevertheless contends that the heinous, cruel, or depraved factor has been applied in an arbitrary manner and, as applied, does not distinguish his case from cases in which the death sentence has not been imposed. In effect Walton challenges the proportionality review of the Arizona Supreme Court as erroneous and asks us to overturn it. This we decline to do, for we have just concluded that the challenged factor has been construed by the Arizona courts in a manner that furnishes sufficient guidance to the sentencer. This being so, proportionality review is not constitutionally required, and we "lawfully may presume that [Walton's] death sentence was not 'wantonly and freakishly' imposed—and thus that the sentence is not disproportionate within any recognized

meaning of the Eighth Amendment." *McCleskey v. Kemp*, 481 U.S. 279, 306, 308, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Pulley v. Harris*, 465 U.S. 37, 43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Further more, the Arizona Supreme Court plainly undertook its proportionality review in good faith and found that Walton's sentence was proportional to the sentences imposed in cases similar to his. The Constitution does not require us to look behind that conclusion.

*Id.* at 656–657, 110 S.Ct. 3047.

In other words, proportionality review is not an adversarial proceeding independent of the sentencing and appeal process. The standard in such an instance is that the sentencer, whether a jury or judge, must have sufficient guidance (statutory or case law) so that the death penalty is not wantonly or freakishly imposed. This being the case, the defendant does not have a right to have a federal court examine the state courts' decision on proportionality review.

Banks argues that he has a "liberty interest" which is not protected because the process of proportionality review is not adversarial, i.e. he did not have the opportunity to challenge or provide input into the decision of the Supreme Court of Pennsylvania. The Supreme Court rejected this argument in *Banks II*. It pointed out that its review is conducted pursuant to its decision in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).[19] *Banks II* at 474. The fact that the opinion gives a reasonable construction to the language is consistent with *Walton* and rebuts any contention that the statute itself gives insufficient guidance.

---

**18.** The provision requiring proportionality review by the Supreme Court of Pennsylvania, 42 Pa.Cons.Stat.Ann. § 9711(h), has been repealed. Act 28, Pub.L. 293, No. 28, § 1 (June 25, 1997), immediately effective. *See also Commonwealth v. Chester*, 1999 WL 419717, at *14 n. 16 (Pa. June 24, 1999).

**19.** This is the same case as reviewed by the Third Circuit in *Frey v. Fulcomer. See* p. 36–37 and n. 17, above.

The Supreme Court also pointed out that the information on which it relied in conducting proportionality review is available at no cost to the public from the Administrative Office of Pennsylvania Courts. Thus, a capital defendant may obtain the information and, if necessary, investigate its accuracy. *Id.* A challenge to the accuracy of such information can be made to the Supreme Court on direct appeal or in a PCRA petition. Banks, for instance, raised his due process argument in his first PCRA petition, as reflected in the opinion. However, as noted by the Supreme Court, he pointed to no actual deficiency or inaccuracy in that information, nor that he was precluded from obtaining or investigating it. As we stated previously:

> In other words, Banks chose to argue the theory that if a deficiency or inaccuracy existed, he had no way to correct it, yet pointed to absolutely no deficiencies or inaccuracies. A theoretical deprivation is not a basis for habeas relief. Moreover, the opinion indicates that such a challenge may be made in the context of a petition for post-conviction relief.

*Banks IV* at 1175.[20]

We also reiterate what we stated previously regarding Banks' argument concerning the vagueness of the phrase "similar cases" for purposes of proportionality review: the phrase is ordinary English, not a term of art. No further clarification of the term is necessary to satisfy the Due Process Clause.

Banks is not entitled to habeas relief on his claim numbered (10).

## X. CONCLUSION

We find no basis for the granting of relief under either of the conditions set forth in 28 U.S.C. § 2254(d), and Banks' petition for a writ of habeas corpus will be denied.

We are required to determine whether Banks has made a substantial showing of the denial of a constitutional right and, if so, to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed.R.App.P. 22(b)(1); *United States v. Eyer*, 113 F.3d 470 (3d Cir.1997). If the Third Circuit determines that we have erred in applying AEDPA to Banks' claim relating to the jury instructions, verdict slip, and jury poll, then we would be constrained by the Third Circuit's opinion in *Frey* to conclude that Banks is entitled to a writ of habeas corpus. We have concluded that the verb tenses used in AEDPA indicate that the state court's holding must contravene Supreme Court precedent existing at the time of the holding. We cannot say conclusively that what seems to be plain language in a statute will govern the Third Circuit's conclusion as to the applicable time period. *See, e.g., Gibbs v. Roman*, 116 F.3d 83, 86 (3d Cir.1997) (prisoner requesting leave to proceed without prepayment of fees under 28 U.S.C. § 1915 must allege that he or she was under imminent danger of serious physical injury at time of incident of which prisoner complains, and not at time of filing of complaint, despite statutory language that action may not be brought without prepayment of fees unless prisoner "*is*" under imminent danger of serious physical injury[21]). *But see Banos v. O'Guin*, 144 F.3d 883 (5th Cir.1998) (per curiam; proper focus is on time suit filed in district court, time of notice of appeal, or time of motion to proceed *in forma pauperis*); *Ashley v. Dilworth*, 147 F.3d 715 (8th Cir. 1998) (focus is on time of "filing"). We

---

20. Since avenues of relief are available in the context of the ordinary criminal proceedings, we conclude that there is no procedural due process deprivation. We therefore do not address the concerns raised as *obiter dicta* by the Third Circuit in a footnote in *Frey*. *See id.* at n. 7.

21. In other words, "is" means "was" or, to quote a statement which has been the subject of considerable public debate in recent months, "It depends on what your definition of 'is' is."

therefore will issue a certificate of appealability based on this issue.

An order consistent with this memorandum will issue.

## ORDER

For the reasons stated in the accompanying memorandum, **IT IS ORDERED THAT:**

1. The petition for a writ of habeas corpus (record document no. 1) filed by petitioner George E. Banks is denied.

2. Banks' motion (record document no. 23) to amend the petition for a writ of habeas corpus is denied.

3. We certify pursuant to 28 U.S.C. § 2253(c); Fed.R.App.P. 22(b), that Banks has made a substantial showing of the denial of a constitutional right, specifically on the issue of whether the Third Circuit's opinion in *Frey v. Fulcomer*, 132 F.3d 916 (3d Cir.1997), *cert. denied*, — U.S. —, 118 S.Ct. 2076, 141 L.Ed.2d 151 (1998), controls our consideration of Banks' petition and therefore requires issuance of the writ of habeas corpus.

4. The stay of execution issued by this court shall remain in effect pending further order of court.

## *COURT'S APPENDIX I*

September 24 & 25, 1982: Shootings and stand-off with police

February 28, 1983: Preliminary competency hearing

March 14, 1983: Competency hearing

May 6, 1983: Competency hearing

June 21, 1983: Banks found guilty by jury

June 22, 1983: Jury returns sentencing phase verdict of death

October 17, 1985: Post-trial motions denied

November 22, 1985: Formal sentence imposed by Court of Common Pleas

February 13, 1987: Pennsylvania Supreme Court affirms judgment of conviction and sentence (*Banks* I)

May 28, 1987: Pennsylvania Supreme Court denies reargument

October 5, 1987: U.S. Supreme Court denies *certiorari*

September 8, 1993: PCRA petition denied

March 27, 1995: Denial of PCRA petition affirmed by Pennsylvania Supreme Court (*Banks II* )

October 2, 1995: U.S. Supreme Court denies *certiorari*

February 15, 1996: Death warrant signed

February 22, 1996: District Court stays execution

March 22, 1996: Petition for writ of habeas corpus filed in District Court

May 28, 1996: Petition found not mixed, unexhausted claims dismissed by District Court (*Banks III*)

August 30, 1996: Petition denied (*Banks IV*)

January 14, 1997: Second PCRA petition filed in Court of Common Pleas

September 19, 1997: Denial of petition for writ of habeas corpus reversed by Third Circuit (*Banks V*)

March 2, 1999: Denial of second PCRA petition affirmed by Supreme Court of Pennsylvania (*Banks VI*)

March 9, 1999: Second execution warrant signed

March 22, 1999: Petition for writ of habeas corpus filed in District Court

March 26, 1999: Execution stayed by District Court

May 7, 1999: Four claims dismissed by District Court as procedurally barred (*Banks VII*)